GENERAL COMMITTEE OF ADJUSTMENT OF BROTHERHOOD OF LOCOMOTIVE ENGINEERS FOR PACIFIC LINES OF SOUTHERN PAC. CO. v. SOUTHERN PAC. CO. et al.

No. 9991.

Circuit Court of Appeals, Ninth Circuit.

Nov. 13, 1942.

Rehearing Denied Jan. 22, 1943.

---

195

C. W. Durbrow, Henley C. Booth, and Burton Mason, all of San Francisco, Cal., for appellee Southern Pac. Co.

Donald R. Richberg, of Washington, D. C., and Felix T. Smith and L. F. Kuechler, both of San Francisco, Cal. (Davies, Richberg, Beebe, Busick & Richardson, of Washington, D. C., and Pillsbury, Madison & Sutro, of San Francisco, Cal., of counsel), for appellee Brotherhood, etc.

Before DENMAN, HANEY, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Appellant, hereinafter called Engineers' Committee, brought suit for a judgment declaring invalid certain provisions in a contract, hereinafter called the Firemen's Schedule, between the defendant below, hereinafter called the Railway, one of the appellees, and the intervenor below, also one of the appellees, hereinafter called the Firemen's Committee. The district court's judgment gave an interpretation of the contract and a declaration of the rights of the contracting parties and their effect upon the intervenor which both the parties to the contract, the Firemen's Committee and the Railway, agree is correct. The Engineers' Committee appeals.

The two Committees are the majority representatives of the Railway's firemen and engineers as members of their respective crafts or classes under Section 2, Fourth and Seventh, of the Railway Labor Act of May 20, 1926, as amended June 21, 1934, hereinafter called the Act. Each Committee, as majority representative, had made for its craft or class an agreement with the Railway concerning rates of pay, rules, and working conditions, hereinafter called the Engineers' Schedule and the Firemen's Schedule.

A. One of the grounds of appeal involves the question whether, in addition to representing the engineer class or craft in bargaining with the Railway for agreements concerning rates of pay, rules, or working conditions of engineer "employees as a class," as provided in Section 2, Fourth,[1] the Act makes the Engineers' Committee also the exclusive representative of the individual engineer in his disputes with the Railway arising from the individual contract of employment which the Rail-

George M. Naus, of San Francisco, Cal. (Clarence E. Weisell and Horn, Weisell, McLaughlin & Lybarger, all of Cleveland, Ohio, of counsel), for appellant.

[1] "Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act [chapter] * * *."

way has with "each employee," as provided in Section 2, Eighth, of the Act.[2]

█ Paragraph Eighth embodies in each of these separate contracts of individual employment when made, here of each engineer, the right of "conferring" "individually," or through his "local representative,"[3] with the management. Obviously, this right of conference by the engineer individually with the employer, includes the right to confer as an individual concerning claims that the Railway has failed to perform the individual's contract in which the right is embodied. It would be ironic comedy to say to the engineer, "True, the Act put this conferring provision in your employment contract, but you cannot use it for any matter arising out of the contract."

█ The individual engineer in making his contract has the right also to negotiate for and agree to any terms of employment with the Railway, and is not required by the Act to accept the rates of pay, rules, or working conditions of the Engineers' Schedule. Virginian Railway Co. v. System Federation, 300 U.S. 515, 557, 57 S.Ct. 592, 81 L.Ed. 789.

Usually, when the engineer makes his individual contract, it is with an implied covenant that his rates of pay, working conditions and the rules governing him are those of the Engineers' Schedule.[4] This, however, does not change the individual character of the contract which each engineer has with the Railway. The craft Schedule is not a contract employing anyone. It is a separate agreement—not between the engineer and the Railway, but —between the craft as an organization and the Railway. As stated, in nearly all cases certain of its terms, by implied reference, are embodied in the individual engineer's employment contract. Under the decision of Virginian Railway Co. v. System Federation, supra, the engineer could have made an employment agreement with the Railway that he was to have the same rates of pay as those of the schedule of a British railway.

The Act provides for the arbitration of disputes arising from both the craft contract and the individual employee contract. The same facts may show a breach of both contracts. That is to say, a breach of the majority craft contract that engineers, when employed, (other than those having the special conditions referred to in the Virginian Railway case,) shall have certain rules and conditions of employment governing them, and also a breach of the individual employment contract of engi-

---

[2] "Eighth. Every carrier shall notify its employees by printed notices in such form and posted at such times and places as shall be specified by the Mediation Board that all disputes between the carrier and its employees will be handled in accordance with the requirements of this Act [chapter], and in such notices there shall be printed verbatim, in large type, the third, fourth, and fifth paragraphs of this section. The provisions of said paragraphs are hereby made a part of the contract of employment between the carrier and each employee, and shall be held binding upon the parties, regardless of any other express or implied agreements between them."

[3] Sec. 2. Fourth. " * * * Provided, That nothing in this Act [chapter] shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization."

[4] The Engineers' Schedule contains no provision concerning representation of engineers in the arbitration of disputes before the Adjustment Board as to whether the Railway has broken the engineer's individual employment contract. It specifically recognizes the individual engineer's right to confer with the Railway under the proviso of Section 2, Fourth, in the following provision of the Engineers' Schedule.

"Representation Rule.

"Sec. 22. The General Committee of Adjustment, Brotherhood of Locomotive Engineers, will represent all locomotive engineers in the *making of contracts*, [not controversies over] rates, rules, working agreement, and interpretations thereof.

All controversies affecting locomotive engineers will be handled in accordance with the *recognized interpretation of the Engineers' contract* as agreed upon between the Committee of the Brotherhood of Locomotive Engineers and the Management.

In matters pertaining to discipline, or other questions not affecting *changes* in Engineers' contract, the officials of the Company reserve the right to meet any of their employes either individually or collectively." (Emphasis supplied).

neers, quite likely subsequently employed, embodying such craft rules and conditions.

The grievances here involved are those arising from claimed breaches of the engineers' individual contracts of employment, having in their terms of agreement the rates of pay, rules and working conditions of the Engineers' Schedule. The Engineers' Committee claims the exclusive right of representation of the individual engineer in such individual grievances in conferences with the Railway and before the first division of the Adjustment Board created by Section 3, First, (h) of the Act, 45 U.S.C.A. § 153, First (h), to arbitrate such grievances, hereinafter called the Board. Section 3, First, (h) provides for four such divisions "whose proceedings shall be independent of one another."

The Railway engineers are usually men who have been firemen. Some who have been members of the Firemen's Brotherhood retain their Firemen's Brotherhood membership after they become engineers, and do not join the Engineers' Brotherhood. Some are members of both Brotherhoods; some of neither organization. The declaratory judgment here sought concerns only members of the Firemen's Brotherhood who may or may not be members of the Engineers' Brotherhood.

The contract between the Firemen's Committee and the Railway provides that an engineer belonging to the Firemen's Brotherhood may have the Firemen's Committee represent him in the handling of "his" grievances. The Engineers' Committee contends he cannot be so represented and sought to have the district court declare inoperative and void the word "engineer" as used in the following provision of the Firemen's Schedule.

"Article 51.

"Adjustment of Differences

"Sec. 1. The right of any *engineer,* fireman, hostler, or hostler helper to have the regularly constituted committee of his organization represent him in the handling of *his* grievances, in accordance with the laws of his organization and under the recognized interpretation of the General Committee making the schedule, involved, is conceded. * * *." (Emphasis supplied).

The district court refused so to declare, and gave its judgment

"a. Intervenor [Firemen's Committee] has the lawful right to represent members of the Brotherhood of Locomotive Firemen and Enginemen, and any other individuals who desire its services, in presenting any type or class of *individual* claims or grievances against defendant arising out of *engine employment,* including *employment* as engineer, and intervenor has the lawful right to handle *such* claims and grievances to a conclusion, and plaintiff does not have the sole, or any, right of representation in any such cases against the will of the individual claimant." (Emphasis supplied).

The Act provides three steps in the process of determining and securing enforcement of the engineer's grievances arising out of a breach by the employing Railway of his individual contract. The first is by negotiation in conferences with the management of the Railway. If no agreement is reached in conference, the next step is by petition to the first division of the Adjustment Board.

Concerning the purpose of the Congress in creating the Adjustment Board and adding to its powers in the amendment of 1934, the Supreme Court says: "By the new measure Congress continued its policy of encouraging the amicable adjustment of labor disputes by their voluntary submission to arbitration before an impartial board, but it supported that policy by the imposition of legal obligations." Virginian Railway Co. v. System Federation, 300 U.S. 515, 542, 543, 57 S.Ct. 592, 597, 81 L.Ed. 789.

If the petitioner prevail before this Board, the Board makes its order directing the Railway to pay the money due, say, for hours of work not credited by the Railway; or, say, if fully paid, to cease from requiring the engineer to work more than a certain number of hours in a certain period of time.

If the Railway refuse to obey the order of the Board, the petitioner may sue in a United States District Court in a proceeding in which the Board's findings and order are prima facie evidence of the facts stated and in which, if the engineer prevail, the court enforces the engineer's right against the Railway by writ of mandamus or otherwise. Act, Section 3, First, (p).

The first, or conference step, in arbitrating a grievance is provided in Section 3, First, (i) of the Act, as follows: "(i) The disputes between *an employee or group of employees and a carrier or carriers growing out* of grievances or out of the *interpretation* or application of agreements concern-

ing rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act [June 21, 1934], shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred *by petition* of the *parties* or by either *party* to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." (Emphasis supplied).

The phrase "an employee" shows that the paragraph contemplates the grievances of an individual under his personal employment contract, above described. By the terms of Section 2, Fourth, that contract provides that he may confer with the employer concerning his contract of employment, either individually or through his local representative. Since the Act itself so gives the individual engineer the right to confer with the Railway, the phrase "usual manner" must mean the steps usually taken by an engineer personally or by his representative through the sub-managerial and managerial personnel "up to and including the chief operating officer."[5] In the cases here contemplated the employee is an engineer having as his local representative the Firemen's Committee. If this negotiation does not settle the grievance, the engineer may file a petition before the Adjustment Board.

When the engineer has filed his petition and thus becomes a party in a proceeding before the Board, his right of representation is provided by Section 3, First, (j) as follows: "(j) *Parties* may be heard either in person, by counsel, or by other *representatives,* as they may respectively elect, and the several divisions of the Adjustment Board shall give due notice of all hearings to the employee or employees and the carrier or carriers involved in any disputes submitted to them." (Emphasis supplied).

The Engineers' Committee contends that the engineer party suing on his individual contract with the Railway can "elect" to have no labor organization representing him other than the Engineers' Committee. The startling injustice of this contention appears from the following: Assume three engineers, each asserting that he is entitled by seniority to have an engine on a certain run. The Railway has decided that A has the seniority. B and C each claims that he is the senior. This may involve a pure question of fact as to date of employment, or resignation and return, or other easily imaginable factual situations. It is destructive of the fundamental concept of representation in such a justiciable controversy that the engineers B and C, each claiming the other not entitled to the run, must have the Engineers' Committee as his representative. Obviously the Engineers' Committee cannot act for both.

More aggravating circumstances can be added to this situation. Such as, that one of the two engineers having the claim against the Railway is a member of the Engineers' Brotherhood in good standing, with his dues paid, and the other, not a member of the Engineers' Brotherhood, has been its bitter opponent and critic. The relationship of confidence and trust necessary between a suitor and his representative would be entirely absent in the second case.

It is no answer to say that the latter engineer may argue his own case, (and, quite likely, have an ass for a client), or may dip into his own pocket and hire an attorney, quite likely for a fee in excess of his claim. The employee's union with its officers skilled in presentation of labor claims and serving him free of cost, is his true need and expectancy.

The fundamental purpose of the Act is to provide a method of settlement of disputes by negotiation and by conducting a proceeding before people skilled in the art or railroading, such as those who composed the Adjustment Board. If, however, a man having his individual contract, recognized by the Act, finds himself deprived of the right of becoming a party before the Adjustment Board, with a skilled and powerful union representing him, by the refusal of that union to accept the representation, as in the case above described, and with no right to seek the representation of any other union, he will be driven into the courts and out of the process contemplated by Congress for the arbitration of his dispute within the provisions of the Act.

What the Engineers' Committee is contending is that instead of there being the above described three statutory steps in the

---

[5] The district court found on sufficient evidence that the customary practice included individual employee conferences, as well as those with Brotherhood representatives.

process, there must be four steps. There would be three tribunals instead of two before whom he must litigate, the first being a union of which he is not a member, in which he litigates his claim against a member of the union.

We cannot believe this was the intent of a Congress, so meticulous in providing for the right of individual conference concerning the individual employment contract of the engineer, and who, the Supreme Court has held, may make any sort of a contract he pleases with the employer.

The provisions of the Act specifically defining the word "representative" lend no support to this contention of the Engineers' Committee. "Representative" as defined in Section 1, Sixth, 45 U.S.C.A. § 151, Sixth, may be *"any * * * labor union,"* whether or not representing a majority of the craft.

"Sixth. The term 'representative' means *any* person or persons, *labor union,* organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." (Emphasis supplied).

█ It is only with reference to craft organization and *collective* bargaining, that is, craft action, that a union chosen as a representative must be that chosen by the majority. Section 2, Fourth, reads: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the *representative of the craft or class* for the purposes of this Act, [chapter]. * * *" (Emphasis supplied).

The general definition of Section 1, Sixth, must mean just what it says,—that *"any * * * union,"* whether of a majority or minority of a craft, may represent "employees" in matters other than collective bargaining, that is, employees having grievances from breaches of individual contracts which "each" has with the carrier.

The Engineers' Committee also contends that its position is aided by the provision of Section 2, Sixth, with respect to conferences with the employer, as follows: "Sixth. In case of a dispute between a carrier or carriers and its or their employees, arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, it shall be the duty of the designated representative or representatives of such carrier or carriers and of such employees, within ten days after the receipt of notice of a desire on the part of either party to confer in respect to such dispute, to specify a time and place at which such conference shall be held: * * *." But in this it ignores the fact that Section 2, Fourth, provides that the engineer may confer individually or through his local representative, a provision which supersedes every other provision in the Act, including Section 2, Sixth. As seen in footnote 4, above, the Engineers' Schedule contains no provision for representation in grievances arising from a claimed breach of the engineer's individual employment contract.

The Engineers' Committee also relies upon the decision of the Supreme Court in Virginian Railway v. System Federation, 300 U.S. 515, 548, 57 S.Ct. 592, 600, 81 L. Ed. 789, and quotes the following language stating that the Act "imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other."

This statement of the Supreme Court does not apply to the individual contract of the engineer and should not be taken out of the context of the opinion. The preceding sentence shows that it applied only to an entirely different kind of contract,—that to be made by a majority representative of the craft for bargaining collectively, and had nothing to do with the individual contract between the engineer and the employer. The language is 300 U.S. at page 548, 57 S.Ct. at page 600, 81 L.Ed. 789 as follows: "The obligation imposed on the employer by section 2, Ninth, * * *, to treat with the true representative of the employees as designated by the Mediation Board, when read in the light of the declared purposes of the act, and of the provisions of section 2, Third and Fourth * * *, giving to the employees the right to *organize and bargain collectively* through the representative of their own selection, is exclusive." (Emphasis supplied).

The sentence quoted by the Engineers' Committee is followed by one showing that the "true representative" there spoken of was the representative of the craft for purposes of collective bargaining. The succeeding two sentences (300 U.S. at pages 548, 549, 57 S.Ct. at page 600, 81 L. Ed. 789) read as follows: "We think, as the government concedes in its brief, that the injunction against petitioner's enter-

ing into *any contract concerning rules, rates of pay, and working conditions* except with respondent, is designed only to prevent *collective bargaining* with anyone purporting to represent employees, other than respondent, who has been ascertained to be their true representative. When read in its context, it must be taken to prohibit the negotiation of labor contracts, *generally applicable to employees* in the mechanical department, with any representative other than respondent [majority representation], but not as precluding such individual contracts as petitioner may elect to make directly with individual employees. The decree, thus construed, conforms, in both its affirmative and negative aspects, to the requirements of section 2." (Emphasis supplied).

At one portion of appellant's brief it asserts, "It is not here contended that the craft member may not individually, without the use or agency of any representative, handle his own case." Yet, when it comes to "an employee" petitioning the Adjustment Board under Section 3, First, (i), after failure individually to adjust his difference by conference, the Engineers' Committee's brief claims that the word "parties" referred to in Section 3, First, (j), "means (as to craft members) the representative designated by the majority of the craft for the purposes of the Act." The absurdity of the contention that the word "parties" does not include the engineer party suing on his employment contract, but means only the representative designated by the majority of the craft, is apparent when we see that the Act provides that such a sole possible party to the proceeding before the Adjustment Board shall be heard "in person," (although it is an unincorporated association,) or by "counsel," or by other "representatives."

If the Engineers' Committee's contention were correct, and the word "representative" wherever used in the Act means "majority representative," and the majority representative is always the party petitioning before the Board, then we have Section 3, First, (j) reading, "The majority representative may be heard by a majority representative." The Engineers' Commit-

tee's contention makes meaningless the word "representative" in this provision of the Act.

The Engineers' Committee continues to press its extreme contention that only the majority craft committee can be the party before the Board, by adopting the reasoning of two decisions—one from the second and one from the third divisions of the Board.[6]

In the case of Gooch v. Ogden Union Railway Company, award No. 514, National Railway Adjustment Board, second division, Gooch, a car inspector, claimed he was improperly discharged and was denied rights under Rule 35 of the Schedule of Rules. Rule 35 provides that such a case must be presented to the Railway officials by the "duly authorized local committee." That is to say, Gooch admitted that the committee, not Gooch, became the petitioner to the Board under Section 3, First, (i), and the party before the Board under Section 3, First, (j). Since this is the right Gooch complained was violated, it is hard to see what leg he had to stand on.

The local committee refused to represent him before the division and he sought to petition it "in person." The Railway contended the division had no jurisdiction to entertain such a personal petition and the contention was sustained.

The opinion bases it conclusion on the fact that the "petitioner *bases his claim* upon the Schedule of Rules in question [Rule 35] which in itself, is a duly executed contract between the union and the carrier. * * * and petitioner *relies upon* such contract stipulations." (Emphasis supplied). Despite lengthy quotations from the Act, the division's opinion never mentions the individual employment contract which "each" employee has with the carrier, or the overriding proviso of Section 2, Fourth, which 2, Eighth, embodies in each such contract.

The opinion assumes the refusal of the craft committee to act for Gooch was not arbitrary. However, it hazards the dictum that even if arbitrary and for unjust motives, the purposes of the Act would be satisfied if the division refused to hear the employee "in person," as provided by para-

---

6 Since the divisions are "independent of one another," neither the second nor third was the administrative body provided by the Act for engineers and firemen. Even if the decisions of these two divisions were not erroneous, they establish no precedent of an administrative practice of the first division administering the law for firemen and engineers.

graph (j). And this as satisfying the provisions of an Act which the Supreme Court holds has as its primary objective "encouraging the amicable adjustment of labor disputes by their voluntary submission to arbitration before an impartial board!" Virginian Railway Co. v. System Federation, 300 U.S. 515, 542, 543, 57 S.Ct. 592, 597, 81 L.Ed. 789.

This decision was followed by the third division in the case of Rudd v. Minneapolis, St. P. &., etc., Ry., award No. 1718. There the local union of the craft arbitrarily refused to represent Rudd, claiming a priority right to a position as timekeeper, because his grievance originated "prior to the time the aggrieved became a member of the Brotherhood." The third division refused to hear him "in person," holding that "orderly administrative procedure demands that presentation of grievances to the Board should be through a Brotherhood." Here, again, the opinion makes no mention of the contract with "each" employee of Section 2, Eighth, with its right of individual conference. Here, also, as in the Gooch case, Rudd admitted his case was not to be handled with the employer "in the usual manner," by stating "that orderly administrative procedure demands that ordinarily presentation of grievances to this Board should be through a Brotherhood."

Apart from the admission, the opinion of the third division has a clear dictum to the effect that a railway employee must join the union of a majority of his craft or he will be denied the arbitral processes of the Act. And this holding that the Act requires that the contract of employment made by the employer and the employee can have its claimed breach heard by the division of the Board only if the employee join a particular union, is of an Act, Section 2, Fifth, of which also provides that no carrier "shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization." That is to say, the Act itself compels the employee to do what it regards as wrongful in the employer.

We do not agree that a railway employee who does not belong to the local of a Brotherhood of his craft at the time his grievances arose, or who belongs to no Brotherhood at all, cannot petition the proper division of the Board under Section 3, First, (j). The true and contrary rule is that held in two decisions of the Emergency Boards, later discussed.

The Engineers' Committee cites phrases in cases concerning provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The purpose of that legislation is not to provide for the adjustment of disputes concerning the terms of employment agreements "by their voluntary submission to arbitration before an impartial board," and which lead to court litigation for their enforcement. The National Labor Relations Act leads only to orders of its Board directing the employer to cease and desist from specific unfair labor practices, defined in that Act, inimical to freedom of labor organization, and to affirmative action by the employer to correct the harm caused by his wrong-doing. Back pay awarded to effectuate the purposes of that Act confers no legal right on the employee to collect it. This court has enjoined suits against an employer to collect back pay awarded by the National Labor Relations Board. National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 125 F.2d 757.

If it be claimed that failure to comply with a back pay or reinstatement decree constitutes a contempt, neither the employee nor his union may sue to punish for the contumacy. The Supreme Court holds that this may be done only by the Labor Board itself, in an opinion contrasting the National Labor Relations Act with the Railway Labor Act, and stating that "decisions dealing with the legal obligations arising under the Railway Labor Act cannot be regarded as apposite" to the National Labor Relations Act. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 269, 60 S.Ct. 561, 565, 84 L.Ed. 738. On the question of the right of an employee to representation in the Railway Labor Act's processes for arbitration of grievances from breach of the employee's contract of employment, the decisions under the National Labor Relations Act can throw no light.

The interpretation we have made is that of the Fifth Circuit in Estes v. Union Terminal Co., 89 F.2d 768, 770, and of two opinions of the Emergency Board appointed by the President under Section 10 of the Act, 45 U.S.C.A. § 160. Unlike the second and third divisions' decisions above cited, the Emergency Boards' decisions directly concerned the firemen's engineers' and conductors' crafts of the first division of the Board. Also, unlike those decisions, the Emergency Board in one of the cases was

construing the same provision of the Firemen's Schedule, Article 51, Sec. 1, here under consideration.

In Re Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, etc., Report of the Emergency Board appointed April 14, 1937, the railway had a secret contract with the Engineers' Committee restricting the handling by the Firemen's Committee of grievances of individual engineers who were members of the Firemen's Brotherhood. The question was whether the Engineers' Brotherhood had an exclusive right to represent engineers in their individual disputes with the carrier. The Emergency Board held that the Firemen's Committee could represent the engineer members of the Firemen's Brotherhood in such disputes, stating:

"When a craft or class, through representatives chosen by a majority, negotiates a contract with a carrier, all members of the craft or class share in the rights secured by the contract, regardless of their affiliations with any organization of employees. It is clearly provided that these rights may be protected by negotiation or by the several methods of adjustment established by the Act. It is true that the representatives of the majority represent the whole craft or class in the *making* [Emergency Board's emphasis] of an agreement for the benefit of all, but it is equally true that nothing in the Act denies the right to any employee, or group of employees, to enforce, through representatives of his or their own choosing, his or their rights under any such agreement. *The whole spirit and intention of the Act is contrary to the use of any coercion or influence against the exercise of an individual's liberty in his choice of representatives in protecting his individual rights secured by law or contract.*

\* \* \* \* \*

"In the present case, the Carrier, in making the [secret] agreement of February 27, 1935, offended not only against the plain intent of the law, but broke its specific agreement with the Brotherhood of Locomotive Firemen and Enginemen, several times reaffirmed, that any engineer member of the latter Organization can have the regularly constituted committee of his Organization represent him in the handling of grievances. There was no restriction in the Firemen's Agreement upon this right. The interpretation of rules were to be made in accordance with the recognized interpretation agreed upon between the Carrier and the Organization holding the [Engineers' craft] contract, *but there was no limitation upon the right of an engineer member of the Brotherhood of Locomotive Firemen and Enginemen to have the committee of his Organization represent him in handling the case,* under the recognized interpretation of the rule applying to his case." (Emphasis supplied, except as indicated).

In the preceding case, In re Brotherhood of Locomotive Engineers, Order of Railway Conductors, etc., another Emergency Board appointed May 26, 1936, in recommending that the two Brotherhoods compose their differences, held: "The right of each organization to represent its members, in whatever capacity employed, must be conceded where representation involves disputes arising under rules or working conditions; the rules in effect for the class of employees and the interpretations placed thereon by the negotiating organization and the carrier will govern."

We hold that so far as concerns an engineer member of the Firemen's Brotherhood, the district court's interpretation of Article 51, Section 1 of the Firemen's Schedule, that the Firemen's Committee may be his representative in the arbitration of his individual grievances under the provisions of the Act, is correct, and affirm its judgment to that effect.

B. The district court declared that certain provisions of the Firemen's Schedule did not regulate the engineers in the exercise of their craft, but were merely conditions to the entry of demoted engineers into their employment of firemen. The Engineers' Committee asserts error in that these provisions do so regulate the craft of engineers and hence constitute a bargaining by the Railway with a representative other than one chosen by a majority of the engineers' craft.

It appears that the provisions of the Firemen's Schedule, of which the Engineers' Committee complain, are identical with those of the Engineers' Schedule. Whether or not the Firemen's Committee was authorized so to contract, exactly the same men will be employed in the engineers' and firemen's crafts and have exactly the same duties and compensation as would be the case if these provisions had not been included in the Firemen's Schedule. The question then suggests itself, whether, granting the Engineers' claim of lack of

authority in the Firemen's Committee, the criticized provisions, so far as concerns the engineers, constitute a matter damnum absque injuria and do not present the "actual controversy" required by the Declaratory Judgment Act, 28 U.S.C.A. § 400, 48 Stat. 955.

■ We are of the opinion that the controversy is an actual one over the right of the Railway to contract at all with the Firemen's Committee. In the case of Virginian Railway Co. v. System Federation, supra, the Supreme Court held the railway employer could be enjoined from making any contract concerning craft conditions with a minority representative of the men of that craft.[7] It was nowhere contended that the contract when made would wrongfully affect the craft as a whole, or that it would be different from that of the majority representative. The injunction was against dealing with the minority committee, whatever might be the resultant contract. If such action may be enjoined, a declaratory judgment on the right to enjoin such action may be had.

The judgment declared that the Firemen's Committee was authorized to make certain provisions of the Firemen's Schedule relative to the employment of firemen who have been engineers and of engineers who have been firemen. It is obvious that so far as the district court's interpretation of the Schedule is concerned, if it does not unlawfully affect the rights of appellant, appellant cannot complain that the words of the agreement appear to have another meaning, and that if so interpreted it would violate appellant's rights.

Parties to a written agreement may stipulate for a declaratory judgment that, so far as concerns the relations created thereby, wherever the word "one" is used in the agreement it means the word "five," and another person claiming to be affected by the contract, who is a party to the proceeding, cannot complain if by the substitution of the word "five" for the word "one" he is not adversely affected. The non-adverse interpretation becomes res judicata between the third party and the two contracting parties. Hence, here this court need concern itself only with the question whether a certain interpretation of pro-visions of the Firemen's Schedule made by the judgment adversely affects the appellant.

The district court has made an interpretation of Article 43 of the Firemen's Schedule, entitled Demotions and Lost Runs and an addendum thereto, on which both contracting parties, the Firemen's Committee and the Railway, are agreed. The interpretation was made in a finding, number 11 (a), which was not incorporated in the judgment, but which the Firemen's Committee and the Railway stipulated should be there incorporated. We order the judgment amended by the insertion of the interpretation stated in finding 11 (a) at the end of paragraph b of the judgment, as follows: "(b) 1. The provisions of Article 43, sections 1, 2, 3, 4 and 6, and the Addendum to Article 43, Application of Mileage Regulations to Part-Time Men, of the Firemen's Agreement, were and are intended to set forth conditions upon which an engineer has the privilege of displacing a fireman and of continuing such displacement. None of said provisions was or is intended to or does regulate the craft of engineers apart from the privilege of a member of that craft to displace a fireman, or prevent the craft of engineers from contracting with the defendant as to different maximum or minimum miles or hours."

The effect of that interpretation and its agreed acceptance by the parties to the contract is shown by the insertion of the bracketed matter in Section 1, Article 43. As so interpreted, the pertinent portions of the Article read

"Article 43

"Demotions and Lost Runs

"Sec. 1. When, from any cause, it becomes necessary to reduce the number of engineers on the engineers' working list on any seniority district, those taken off may, if they so elect, displace any fireman their junior on that seniority district under the following conditions: [Including Sections 2, 3, 4 and 6 below]

"First: That no reduction will be made so long as those in assigned or extra passenger service are earning the equivalent of 4000 miles per month; in assigned, pooled or chain-gang freight, or other

---

[7] "Both the statute and the decree are aimed at securing settlement of labor disputes by inducing collective bargaining with the true representative of the employees *and by preventing such bargaining with any who do not represent them.*" (Emphasis supplied.)

service paying freight rates, are averaging the equivalent of 3200 miles per month; on the road extra list are averaging the equivalent to 2600 miles per month, or those on the extra list in switching service are averaging 26 days per month.

"Second: That when reductions are made they shall be in reverse order of seniority.

"Sec. 2. When hired engineers are laid off on account of reduction in service, they will retain all seniority rights; provided, they return to actual service within 30 days from the date their services are required.

"Sec. 3. Engineers taken off under this rule shall be returned to service as engineers in the order of their seniority as engineers, and as soon as it can be shown that engineers in assigned or extra passenger service can earn the equivalent of 4800 miles per month; in assigned, pooled, chain-gang or other regular service paying freight rates, the equivalent of 3800 miles per month.

"Sec. 4. In the regulation of passenger or other assigned service, sufficient men will be assigned to keep the mileage, or equivalent thereof, within the limitation of 4000 and 4800 miles for passenger and 3200 and 3800 miles for other regular service, as provided herein. If, in any service, additional assignments would reduce earnings below these limits, regulation will be effected by requiring the regu-

lar assigned man or men to lay off when the equivalent of 4800 miles in passenger or 3800 miles in other regular service has been reached.

"On road extra list, sufficient engineers will be maintained to keep the average mileage, or equivalent thereof, between 2600 and 3800 miles per month; provided that when engineers are cut off the working list and it is shown that those on the extra lists are averaging the equivalent of 3100 miles per month, engineers will be returned to the extra lists if the addition will not reduce the average mileage, or the equivalent thereof, below 2600 miles per month.

"Where separate extra lists are maintained for yard service, sufficient engineers will be maintained to keep the average earnings between 26 and 35 days per month; provided that when engineers are cut off the yard working list and it is shown that men are averaging the equivalent of 31 days per month, engineers will be returned to service if the addition will not reduce the average earnings below 26 days per month.

"Note: As to mileage regulations affecting part-time men, see addendum to Article 43, pages 118-119-120.

"Sec. 5. * * *

"Sec. 6. In making reductions and replacing firemen upon the service lists, the same mileage shall apply as in the case of engineers. * * *." [8]

---

[8] An addendum to this Article reads:

"We understand also from your conversation with respect to part-time men, whether they be engineers and firemen or conductors and trainmen, a sound and practical basis for adjustment would be to permit each organization to regulate the conditions of the part-time man during the time that these men are employed at the occupation covered by such organization. Thus if the mileage limitation on any road was 3300 miles for firemen and 3800 miles for engineers, a man in freight service making 1500 miles as a fireman, then used as emergency engineer for 500 miles, would be permitted to make only 1300 additional miles as a fireman; or a man making 2000 miles as an extra engineer who is cut off the engineer's extra board, would be permitted to make only 1300 additional miles as a fireman. On the other hand, a fireman who has made his maximum mileage of 3300 miles and has been taken off on that account, might be used as an emergency engineer or go on the engineer's extra board for the re-

mainder of the month to make the additional 500 miles up to 3800 in accordance with the engineers' mileage limitation.

"We understand from the discussions also that nothing in such a regulation of the part-time men would prevent any organization from regulating the mileage of its own men by adjustment at the end of each month or checking period, in order to offset any excess mileage that an individual may have made. That is to say, if a trainman had made 400 extra miles as an emergency conductor in any one month or checking period, and if at the end of that month or checking period he was working as a trainman, the trainmen's organization would have authority to regulate him to bring his mileage within the trainmen's limitation. If, on the other hand, the man was working as a conductor at the end of the month or checking period, he would be subject to the regulation of the conductors' organization. The point, as we understood it, was that each organization would be free

■ The appellant claimed below that Sections 2, 3, 4 and 6, as drawn, are not such conditions, but direct attempts to prescribe mileage and other provisions of the employment of engineers. The Railway and the Firemen's Brotherhood agree that they were solely conditions of engineers' entry into and their employment as firemen, and do not control engineer employment. Since this judgment so declaring the meaning of Sections 2, 3, 4 and 6 is res judicata as between the Firemen's craft and the Railway on the one hand, and the Engineers' craft on the other, the Engineers' Committee cannot claim that there was error in the interpretation. If error, it was not prejudicial, for the interpretation in effect is that which the Engineers Brotherhood claims, namely, "that Sections 2, 3, 4 and 6 of Article 43 of the Firemen's Agreement shall be limited in their application to conditions under which demoted engineers enter, remain in, and leave the firemen's craft, and that said sections * * * [are] invalid in so far as they seek to prescribe conditions of reentry into the engineers' craft or to regulate the mileage of engineers or the number of engineers to be assigned to engineers' working lists, whether in passenger, freight, or extra service." This, of course, is subject to the right of the individual craftsman to make such a contract with the Railway as they may agree upon, as recognized in the Virginian Railway case, supra.

The judgment holds that the following interpretative questions and answers in Article 37 of the Firemen's Schedule are valid and do not infringe any right of the Engineers' craft.

"Article 37.

"Section 15. * * *

"Question: (a) If it becomes necessary to call a fireman for service as an emergency engineer, when the engineer's extra list is exhausted, who should be called?

\* \* \* \* \*

"Answer: (a) The senior available qualified man in accordance with his seniority as engineer.

"(b) Should a senior demoted engineer holding assignment as fireman become available [as engineer] after man used [as engineer] under (a) returns to terminal or completes day's work, who should be used?

\* \* \* \* \*

"(b) The senior available man."

■ It is obvious that the answers may control the conditions under which one then a fireman may be employed as an engineer. While the Firemen's Committee and the Railway well may provide who may become subject to the Firemen's craft regulations, neither has the power to say that a fireman may not quit his employment in that craft if he so desires. The Railway also may agree with the Engineers' craft as to conditions under which one may be employed as an engineer, whether then or formerly employed as a fireman. It is, our opinion that the Act contemplates that the cleavage of the powers of the firemen and engineers' crafts to agree with the employer is at the point of imposing conditions of entry into the one craft or the other.

The Firemen's Brotherhood claims such a cleavage fails to recognize what it calls the "ebb and flow" of men between the two crafts. The Supreme Court has held that all the employees of the two crafts do not necessarily so ebb and flow. All the parties are in accord that there is no closed shop agreement with regard to either craft, as there cannot be in view of the Virginian Railway case, supra. Hence, the Railway may employ as engineer an engineer just from the Guatemalan Central Railway. He would not have flowed out of the Southern Pacific Railway's firemen and hence not ebb back into them.

However, the so-called ebb and flow of a large part of the men of the two crafts existed and was a matter of general notice when Congress passed the Railway Labor Act and its amendments. Instead of providing for such control of the ebb and flow as the Firemen's Brotherhood claims, it gave to each craft the control of its members so far as concerns craft conditions. If it had intended to limit the entry into the craft of engineers to promotion from the craft of firemen, it could have made it plain in the Act. The absence of such a provision, in view of the existing ebb and flow, is significant.

---

to make adjustment for excess mileage of the men under its jurisdiction to bring them within the mileage limitations set by that organization. And the fact as to whether a man was subject to the jurisdiction of one organization or another would be established by the craft that he was working in at the end of the month or checking period."

Instead, as held in the Virginian Railway case, either the individual fireman or engineer may make such a contract with the Railway as he pleases, regardless of the ebb' and flow. If the Firemen's Brotherhood would secure such subservience of the engineers and such dominion over the movement of men between the two crafts as it claims, namely, the right to control what it calls the "promotion" into the engineers, as well as the "demotion" of engineers into the firemen, it should seek from Congress an amendment to the Act with respect to the right of each craft to control the conditions of its members' employment. Or, to pursue the suggestion made at the hearing by the Firemen's Brotherhood's experienced counsel, Congress might consider legislation that the functions of firemen and engineers are those of a single craft, and, hence, make advisable the combination of the two Brotherhoods into one.

We agree with the contention of the Engineers' Committee that the judgment erred with respect to the interpretation of the questions and answers of Article 37, Section 15, and order stricken from Section b. of the judgment the words "Article 37, section 15, Questions and Answers," and that there be added to the judgment the following paragraph, succeeding paragraph b. (1): "b. (2) The questions and Answers of Article 37, Section 15, are under the Railway Labor Act valid only in so far as they relate to their rights of firemen as such under said section. They are invalid under said Act in so far as they relate to entry of a fireman into the craft of engineers."

The judgment appealed from, amended as above provided, is affirmed.