**W.G. TAYLOR, K.P. Brockhoeft, A.J. Ruiz, Wayne A. Sepcich and Brotherhood of Locomotive Engineers**

v.

**MISSOURI PACIFIC RR CO. and United Transportation Union.**

Civ. A. No. 84–700.

United States District Court, E.D. Louisiana.

March 20, 1985.

Harold A. Ross, Cleveland, Ohio, Louis L. Robein, Jr., Metairie, La., for plaintiffs.

Dennis M. Angelico, New Orleans, La., Norton N. Newborn, Cleveland, Ohio, for United Transp. Union.

Harry & Rosenberg, New Orleans, La., for Missouri Pacific R.R. Co.

## ORDER AND REASONS

DUPLANTIER, District Judge.

Plaintiffs Taylor, Brockhoeft, Ruiz and Sepcich are railway workers employed by defendant Missouri Pacific Railroad Company ("MOPAC"). Plaintiff Brotherhood of Locomotive Engineers ("BLE"), of which the individual plaintiffs are members, is the collective bargaining representative pursuant to the Railway Labor Act ("RLA" or "Act"), 45 U.S.C. §§ 151–163 (1972), for the craft of locomotive engineers employed by MOPAC. Defendant United Transportation Union ("UTU") is the collective bargaining representative for the crafts of switchmen and firemen employed by MOPAC. The rates of pay, rules, and working conditions for the crafts employed by MOPAC are established by agreement between MOPAC and the collective bargaining representative of each respective craft. Although the individual plaintiffs are mem-

bers of BLE, the engineer's collective representative, they work principally as switchmen.

At various times during late 1983 and early 1984 the individual plaintiffs either were subjects of MOPAC disciplinary proceedings or filed grievances with MOPAC. In all instances, the grievances and disciplinary proceedings concerned the plaintiffs' services as switchmen.

The individual plaintiffs sought representation by their union, BLE, at the MOPAC disciplinary and grievance proceedings. MOPAC, however, refused their requests, basing its position on provisions of two collective bargaining agreements between MOPAC and UTU that establish terms and conditions of employment for MOPAC switchmen: Articles 18 and 23 of the January 1, 1974, Agreement and Section 17 of the August 11, 1948, Agreement. (*See* Appendix). The parties to this suit agree that these provisions are intended to limit a switchman's choice of representatives before a disciplinary or grievance proceeding to himself or a UTU representative, even though that switchman may be a member of BLE rather than UTU. Thus, the provisions vest in UTU an exclusive right to represent MOPAC employees in proceedings concerning switchmen services.

The individual plaintiffs, joined by BLE, instituted this action in which they seek a declaration that the exclusive representation provisions of the UTU/MOPAC agreements violate employees' rights under the RLA and are null and void insofar as they restrict plaintiffs' rights to have their grievances and disciplinary matters handled at all levels by BLE representatives.[1] We now consider extensively briefed cross motions for summary judgment filed by plaintiffs and by defendant UTU.

■ Defendant MOPAC opposes both motions for summary judgment. To the extent that MOPAC's opposition resurrects the question of this court's jurisdiction to

---

**1.** We defer consideration of further relief sought by plaintiff, including prospective injunctive relief, the nullification of the proceedings at which plaintiffs were denied BLE representation, and BLE's claim for damages against MOPAC for loss of membership resulting from MOPAC's refusal to treat with BLE representatives.

adjudicate this labor dispute, we reiterate our ruling on MOPAC's previously considered motion to dismiss. Contrary to MOPAC's contentions, this case does not present a "major dispute" regarding the jurisdiction of competing unions over which the National Mediation Board has exclusive jurisdiction. RLA Section 2, Ninth (45 U.S.C. § 152, Ninth). This case presents no issue about UTU's authority to make agreements with MOPAC relating to the working conditions, rules, and pay of MOPAC switchmen. *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). Nor is this matter a "minor dispute" arising out of a grievance or dispute regarding the interpretation or application of a collective bargaining agreement provision, over which the National Railroad Adjustment Board, RLA Section 3, First (i), or alternatively, a Special Adjustment Board, RLA Section 3, Second, may have exclusive jurisdiction. The parties agree that the challenged provisions of the UTU/MOPAC agreements purport to create an exclusive right of UTU to represent switchmen at all MOPAC company level proceedings. The issue presented is whether these exclusive representation provisions can prevent a member of the BLE from choosing as his representative at a company level grievance or disciplinary proceeding a BLE union official, in view of the rights of employees under the RLA. Since the issue is one of validity, not interpretation, it is for judicial consideration. *See Felter v. Southern Pacific Co.*, 359 U.S. 326, 327 n. 3, 79 S.Ct. 847, 850 n. 3, 3 L.Ed.2d 854 (1959); *Order of Railway Conductors & Brakemen v. Switchmen's Union of North America*, 269 F.2d 726 (5th Cir.1959). Nothing in the RLA restricts the court's jurisdiction to determine whether the exclusive representation provisions of the UTU/MOPAC agreements are valid.

■ The factual disputes are minimal and, in any event, immaterial. The resolution of this matter turns on a pure question of law. Therefore, the case is ripe for summary judgment. We conclude that plaintiffs are entitled to relief and order judgment accordingly.

At the outset of our analysis we note that the language of the Act provides no clear answer to the question before us. Furthermore, we find no binding precedent. Indeed, of the several reported decisions concerning representational rights in minor disputes, only two directly address the narrow question with which we are concerned: an employee's right under the Act to designate as his representative at company level dispute proceedings the railway union of which he is a member but which is not the certified bargaining representative of the craft in which he was working at the time the dispute arose. *See McElroy v. Terminal Railroad Association of St. Louis*, 392 F.2d 966 (7th Cir.1968), *cert. den.*, 393 U.S. 1015, 89 S.Ct. 610, 21 L.Ed.2d 559 (1969); *General Committee of Adjustment of Brotherhood of Locomotive Engineers for Pacific Lines of Southern Pacific Co. v. Southern Pac. Co.*, 132 F.2d 194 (9th Cir.), *rev'd on other grounds*, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85 (1943). Only one case, *McElroy*, is an action by a member of one craft union seeking to nullify the exclusive representation agreement between the employer and the collective bargaining agent union for the craft in which the employee was working when the dispute arose.

Absent prohibition by the Act, the exclusive representation agreements would be valid and enforceable contractual provisions, although they prevent an employee from having his own union represent him at company level proceedings involving a labor contract with a different union. The reported decisions interpreting the Act vis-a-vis an employee's choice of representative exemplify the diverse interpretations to which the Act lends itself. The disparate results and reasoning in these decisions suggest two reasonable assessments of the Act. First, the Act's failure to address the specific issue before us may be caused by the failure of the drafters to anticipate such a dispute. Alternatively, Congress might have intended a definite stance on

the issue; if so, the draftsmanship of the Act is wanting in clarity.

Reading the language of the Act "not in a vacuum, but in the light of the policies [it] was intended to serve," *Pennsylvania R.R. Co. v. Rychlik*, 352 U.S. 480, 488, 77 S.Ct. 421, 425, 1 L.Ed.2d 480 (1957), we conclude that under the Act the individual plaintiffs are entitled to designate their union, BLE, to represent them in company level proceedings notwithstanding the UTU/MOPAC agreements to the contrary. We hold that the Act renders null and unenforceable the exclusive representation provisions of the UTU/MOPAC agreements insofar as they prevent a member of a railway union from selecting his own union rather than the bargaining representative union of the craft in which he is working to assist him at company level proceedings. We do not pass upon the question of whether an employee has a right under the Act to select any person or organization other than his own union as his representative at company level proceedings.

The general purposes of the Act are delineated in RLA Section 2 (45 U.S.C. § 151a). Section 2 reflects the congressional intent to create and maintain stable relations between labor and management in a vital national industry. *See Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). One of the specific objectives of the Act is to forbid "any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization." RLA Section 2(2) (45 U.S.C. § 151a(2)). Inherent in the right of an employee to join a railway employees labor union of his choice is the right to enjoy fully the fundamental benefits of union membership. It is difficult to conceive of a benefit of union membership more fundamental than union representation in employee/employer dispute proceedings.

In the 1951 amendments to the Act concerning union shops in the railroad industry, Congress reaffirmed each employee's right to belong to a railway union of his choice. Through Section 2, Eleventh, Congress allowed carriers and unions to establish union shop requirements, which make membership in a union a condition of employment. However, a typical union shop agreement could cause significant problems because of an unusual characteristic of the railroad industry: the shuttling back and forth between crafts (and union jurisdiction) of employees traditionally organized along craft lines. To forestall such problems, Congress included in the union shop section of the Act a specific provision to the effect that membership in any railway employees union national in scope satisfies the union membership requirement of any other such union's contract with the employer. "The requirement of membership in a labor organization in an agreement ... shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service ... if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter, and admitting to membership employees of a craft or class in any of said services...." RLA Section 2, Eleventh (c) (45 U.S.C. § 152, Eleventh (c)). It is not disputed that both UTU and BLE are the type of labor organizations referred to in the quoted provision.

This recognition of an employee's right to maintain his union membership while working in a craft not represented by his union was designed to protect employees from the expense of being required to belong to more than one union or the likely loss of union benefits that would result if an employee were required periodically to shift his union membership. *See Rychlik, supra*, 352 U.S. at 490, 77 S.Ct., at 426. In *Rychlik* the Supreme Court noted that by this provision of the Act Congress conferred upon qualified craft unions the right to "assure members employment security, even if a member should be working temporarily in a craft for which another union is the bargaining representative." *Id.* The obverse of the Court's observation is that

the provision gives union members the right to be assisted by their union in employment security matters. Grievance and disciplinary proceedings arising out of work in a craft for which another union is the bargaining representative clearly fall within the purview of employment security.

Section 2 and Section 2, Eleventh (c) would clearly prohibit UTU from contracting with MOPAC to prohibit MOPAC employees working within UTU's craft from joining BLE. Congress conferred upon the plaintiff employees a right to belong to BLE. It follows, then, that UTU and MOPAC cannot lawfully contract to strip MOPAC employees of a basic privilege of union membership. The employee's right to belong to a union of his choice would be hollow if this court enforced a contract between the employer and a rival union which stripped the employee of his right to have his union represent him at company level dispute proceedings with the employer.

No provision in the Act appears to address specifically the issue before us. The language of the Act is notably ambiguous in its many references to the "representative" of an employee. Section 2, Sixth typifies the ambiguity of the Act:

> In case of a dispute between a carrier and its or their employees, arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, it shall be the duty of the *designated representative* of such carrier or carriers and of such employees, within ten days after the receipt of notice of a desire on the part of either party to confer in respect to such dispute, to specify a time and place at which such conference shall be held. RLA Section 2, Sixth (45 U.S.C. § 152, Sixth). (emphasis added).

The defendants argue, with some logic, that "designated representative" refers to the certified collective bargaining representatives of the employee's craft. On the other hand, "designated representative" reasonably may be interpreted to mean a representative of the union "designated" by the employee, the union of which he is a member. The Act gives that membership special status; in the spirit of the Act, we adopt the interpretation of the above quoted language which gives full measure to the protected union membership.

There is merit to the defendants' contention that an employee who enjoys the benefits of a collective bargaining agreement must accept the limitations established by that agreement, including exclusive representation provisions. That logical argument must yield to the compelling evidence of Congress's intent to assure each employee the right to enjoy unimpeded the privileges and benefits of membership in the union of his choice.

Our conclusion fosters the Act's explicit objective of providing for the prompt settlement at the company level of all disputes growing out of the application or interpretation of collective bargaining agreements. RLA Section 2(4) and Section 2, First and Second (45 U.S.C. § 151a(4) and § 152, First and Second). *See General Committee v. Southern Pacific Co., supra,* 132 F.2d at 198. When an employee elects to be a member of one union rather than another, he is, among other things, designating the union representative in which he wishes to place his trust and confidence with respect to employment matters. The employee reaffirms his preference when he designates his union to represent him at company level dispute proceedings, as the individual plaintiffs did in this case. This relationship of trust and confidence surely will facilitate the dispute resolution process. *Id.* Although representation by a different union pursuant to an exclusive representation provision may yield similar results, the likelihood of settlement at the company level is certainly greater when the employee is represented by his own union.

The defendants assert that the exclusive representation requirement is a necessary and desirable means for a collective bargaining representative to protect the integrity of the collective bargaining agreement. Even minor dispute resolution at the com-

pany level implicates the duty of the collective agent to negotiate and protect the terms of employment for the craft it represents, because the resolution of minor disputes often turns on interpretations of the collective agreement. In some instances the resolution of a minor dispute may have implications broader than the immediate case by influencing the practical application of the collective agreement in subsequent cases. *See, e.g., Elgin, J. & E. Ry Co. v. Burley,* 325 U.S. 711, 729–41, 65 S.Ct. 1282, 1292–98 (1945); *General Committee of Adjustment, United Transportation Union v. Burlington Northern, Inc.,* 563 F.2d 1279 (8th Cir.1977), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980). However, the resolution of many minor disputes at the company level depends upon factual determinations rather than novel interpretations or applications of the collective agreement.

In any event, our ruling does not interfere with the collective bargaining representative's ability to perform its duties. A craft representative may be a necessary party to a company level proceeding potentially affecting other employees, even though the employee directly involved has designated his own union to represent him. We certainly do not hold that the craft representative must be excluded from the company level proceedings in those instances; the craft representative's participation protects the interests and obligations of the collective bargaining union to represent the craft which it is designated to represent. *Accord Burley, supra,* 325 U.S. at 737 n. 35, 65 S.Ct. at 1296–96 n. 35. (to exclude the collective agent from any voice whatever in the collective agreement's interpretation would go too far toward destroying its uniform applications); *McElroy, supra,* at 972 (a "right to participate clause" in union/carrier agreements may be permissible). Furthermore, because the carrier may not unilaterally alter the terms of a collective agreement, the carrier should follow precedent established in proceedings with the collective agent. *See Burlington Northern, supra,* 563 F.2d at 1284.

For the foregoing reasons, we hold that the exclusive representation provisions in the UTU/MOPAC agreements are inapplicable to the individual plaintiffs in this case and do not bar them from having BLE representation at company level dispute proceedings. We will enter judgment in accordance with these findings.

APPENDIX

AGREEMENT

between

TEXAS PACIFIC–MISSOURI PACIFIC
TERMINAL RAILROAD OF
NEW ORLEANS

and the

UNITED TRANSPORTATION UNION

Schedule of Pay Allowed and Rules
Governing Switchmen

Reprinted

January 1, 1974

ARTICLE 18

Discipline and Grievances

(a) No employee covered by this agreement will be suspended, discharged, or unfavorable entries made against his record without just and sufficient cause, and not until he has had a fair and impartial investigation. Investigations will be held promptly, ordinarily within ten (10) days after the offense has been committed, to which a decision in writing will be rendered within ten (10) days after the investigation or the case will be considered closed. When brought to trial for any offense, the charge will be specified in writing, and the employe charged shall have the right to have another employe covered by this agreement, or a duly accredited representative of the UTU to assist at such investigation, and to procure witnesses to testify in his defense, to examine all papers used in the investigation, and to question all persons giving evidence in his case. The employe charged and his representative will be furnished a copy of the transcript of the investigation on request. In case he is not

satisfied with the result of said investigation, he shall have the right to appeal within ten (10) days, to his superior officer in person, or through his representative, as above specified. (T–32141)

(b) In case his suspension or dismissal is found to be unjust, he shall be reinstated and paid for all time lost. All complaints made by one employe against another, covered by this agreement, must be made in writing.

(c) If an employe is asked to sign a statement, the contents of same should be made entirely clear to him and a copy of such statement furnished to him, if desired.

(d) In the handling of grievances, including time claims, the chairman will inform the officer rendering decision within a reasonable time when a decision is accepted; in the event question in dispute has been handled with the officer having final authority, and his decision is not acceptable, the chairman will so notify him of this fact within a reasonable time.

### ARTICLE 23

#### Representation and Rulings

(a) The right to negotiate and interpret schedule rules and agreements covering rates of pay and working conditions of employes covered by this agreement, is vested in the General Grievance Committee of the UTU and the Railroad.

(b) The right of employes covered by this agreement to have the regularly constituted committee of his organization represent him in the handling of his grievances under the recognized interpretation placed upon the agreement involved between the officials of the Railroad and the General Grievance Committee making same is conceded.

(c) Any rulings made with reference to any Article enumerated herein by the proper Official of the Railroad will be made in writing, and the Chairman of the General Grievance Committee, UTU, will be furnished a copy of said ruling, but said ruling shall not be made effective until agreed to between the parties herein mentioned.

(d) This agreement as rewritten is effective 1–1–74 and supersedes Yard Agreement effective 10–7–57 with the understanding that other written agreements and settlements on matters not covered by this rewritten agreement are not cancelled and that written agreements, rulings, settlements, and interpretations and decisions and awards of tribunals authorized to represent the parties hereto interpreting the rules of the agreement named herein are not superseded by this rewritten agreement.

This agreement shall remain in effect until and unless changed in accordance with the Railway Labor Act. Revised January 1, 1974.

### AGREEMENT—August 11, 1948
### SECTION 17—TIME LIMIT ON CLAIMS

Section 17—Time Limit on Claims.

\* \* \* \* \* \*

(a) All claims or grievances must be presented in writing by or on behalf of the employe involved, to the officer of the company authorized to receive same, within sixty days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the carrier shall, within sixty days from the date same is filed, notify the employe or his representative of the reasons for such disallowance. If not so notified, the claim or grievance shall be considered valid and settled accordingly, but this shall not be considered as a precedent or waiver of the contentions of the carrier as to other similar claims or grievances.

(b) If a disallowed claim or grievance is to be appealed, such appeal must be taken within sixty days from receipt of notice of disallowance, and the representative of the carrier shall be notified of the rejection of his decision. Failing to comply with this provision the matter shall be considered closed, but this shall not be considered as a precedent or waiver of the contentions of the employes as to other similar claims or grievances.

(c) The procedure outlined in paragraphs (a) and (b) shall govern in appeals taken to each succeeding officer. Decision by the highest officer designated to handle claims and grievances shall be final and binding unless within sixty days after written notice of the decision of said officer he is notified in writing that his decision is not accepted. All claims or grievances involved in a decision of the highest officer shall be barred unless within six months from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative before a tribunal having jurisdiction pursuant to law or agreement of the claim or grievance involved. It is understood, however, that the parties may by agreement in any particular case extend the six months period herein referred to.

(d) All rights of a claimant involved in continuing alleged violations of agreement shall, under this rule, be fully protected by continuing to file a claim or grievance for each occurrence (or tour of duty) up to the time when such claim or grievance is disallowed by the first officer of the carrier. With respect to claims and grievances involving an employe held out of service in discipline cases, the original notice of request for reinstatement with pay for time lost shall be sufficient.

(e) This rule recognizes the right of representatives of the organizations parties hereto to file and prosecute claims and grievances for and on behalf of the employes they represent.

(f) This rule shall not apply to requests for leniency.