**Paul G. LANDERS, Plaintiff, Appellant,**

**v.**

**NATIONAL RAILROAD PASSENGER CORPORATION, et al., Defendants, Appellees.**

**No. 86–1776.**

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1987.

Decided March 24, 1987.

Clinton J. Miller, III, Asst. Gen. Counsel, Washington, D.C., with whom James F. Freeley, Jr. and Freeley & Freeley, Boston, Mass., were on brief for plaintiff, appellant.

---

Harold A. Ross with whom Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, Paul Kelly and Segal, Roitman & Coleman, Boston, Mass., were on brief for Brotherhood of Locomotive Engineers.

Joanna L. Moorhead, Washington, D.C., with whom William Shaw McDermott and McDermott & Rizzo, Boston, Mass., were on brief for National R.R. Passenger Corp.

Before COFFIN and SELYA, Circuit Judges, and GIGNOUX,* Senior District Judge.

SELYA, Circuit Judge.

The appellant, Paul G. Landers, has been working on the railroad for numerous livelong days. During the last four years, he passed the time away as an engineer for defendant/appellee National Railroad Passenger Corporation (Amtrak). Amtrak was created by the Rail Passenger Service Act of 1970, 45 U.S.C. §§ 541 *et seq.* Pursuant to 45 U.S.C. § 546(b), Amtrak is subject to the federal labor statutes governing railroads. Accordingly, the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* (RLA), applies to this case.

Amtrak and the defendant/appellee Brotherhood of Locomotive Engineers (BLE), a labor union, entered into a collective bargaining agreement (Agreement). The Agreement, inter alia, denominated the BLE as the bargaining representative for Amtrak's passenger engineers and provided a panoply of terms and conditions of employment for the craft (or class) of passenger engineers. While the Agreement was signed on October 26, 1982, Amtrak did not begin employing passenger engineers directly until January 1, 1983. The appellant was among the early hires; he was a member of the United Transportation Union (UTU), rather than the BLE.

On February 17, 1984, Landers was charged with misconduct while toiling on an Amtrak train. A company-level investigatory hearing was convened. The appellant asked to be represented by the UTU. Amtrak demurred, taking the position that, under the Agreement, a passenger engineer could be assisted at such a hearing only by the bargaining agent. Landers represented himself at the hearing; he received and served a thirty day suspension. He did not claim an appeal to the National Railroad Adjustment Board (Board), a forum in which he had an undisputed right to be represented by the UTU. *See* 45 U.S.C. § 153, First (j). Instead, Landers brought suit in the United States District Court for the District of Massachusetts seeking declaratory relief against both Amtrak and the BLE. He claimed that his prerogatives under §§ 2 and 3 of the RLA, 45 U.S.C. §§ 152, 153, were transgressed when he was denied the "right" to have his union represent him at the investigatory hearing.

Following a bench trial, the district court (Keeton, J.) issued a thoughtful memorandum of decision. *Landers v. National Railroad Passenger Corporation*, C.A. No. 84-467-K (D.Mass. June 24, 1986) (*Landers I*). Judge Keeton found that the Agreement prohibited an employee's representation by the (minority) union of his choice in an on-property investigatory hearing. *Id.* at 17-18. Landers does not dispute this point. He does, however, hotly contest the court's holding that nothing in the RLA or in the facts of the case gave Landers an unfettered right to representation at such a session by a union other than the BLE. *Id.* We agree with the district court, and therefore affirm.[1]

### I.

We start with a brief overview of certain provisions of the Agreement. Pursuant to Rule 1b therein, Amtrak recognized the BLE "as bargaining representative of all Passenger Engineers employed by [Amtrak] in the Northeast Corridor." Rule 1c defined "duly accredited representative" to mean the "General Chairman of the Brotherhood of Locomotive Engineers having

---

* Of the District of Maine, sitting by designation.

1. Amtrak and the BLE originally contested subject matter jurisdiction and raised the spectre of (non)exhaustion of administrative remedies. The district court ruled adversely to them on these topics. *Landers I*, slip op. at 1-8. The appellees have not pressed the points further.

jurisdiction or any elected officer of the Brotherhood of Locomotive Engineers designated by the General Chairman." Further provisions of the Agreement illuminated the significance of these designations. Two examples will suffice. Under Rule 20a "[a] claim for compensation alleged to be due may be made only by a claimant or, on his behalf, by a duly accredited representative." Under Rule 21e.5 "[a] Passenger Engineer who may be subject to discipline and his duly accredited representative will have the right to be present during the entire investigation."

In fine, the Agreement clearly limited representation with regard to claims and disciplinary hearings. By its own terms and tenor, the BLE—and only the BLE— was entitled to represent a passenger engineer at a company level disciplinary hearing. In an effort to deflect that exclusivity, the appellant challenges the legal validity of the contractual construct. He contends that the RLA overrides any deal which was struck between Amtrak and the BLE. We turn, then, to this assertion.

## II.

The appellant makes much of the legislative history of the RLA. The archives of Congress show, he urges, that railroad employees historically enjoyed representation by minority unions in grievance matters, so the Act must be read in such a light. But, this allegation collapses under its own weight. Landers supports it principally by reference to the testimony of two witnesses who appeared before a House committee over half a century ago regarding possible amendments to the RLA. This duo, Commissioner Eastman and Mr. Harrison, lobbied for amendments which never saw the legislative light of day. *See* Hearings of House Committee on Interstate and Foreign Commerce on Railway Labor Act Amendments, H.R.Rep. No. 7650, 73d Cong., 2d Sess. 44, 89 (1934). The changes that these witnesses advocated (giving employees the right to choose their own representation during grievance proceedings) were rejected. Rather than helping Landers, the fact that such changes were thought necessary by the proponents of elective (minority union) representation is itself formidable evidence that the RLA conferred no such right. And, the revisions that did eventuate in 1934 are of scant comfort to the stance of the present plaintiff. Our review of the matter discloses that there were two major purposes of these amendments: (1) to protect an employee's freedom to join his preferred union, and (2) to create the Board, thereby providing an effective (nonjudicial) means for the settlement of grievances and other "minor disputes." [2] *See* H.R.Rep. No. 1944, 73d Cong., 2d Sess. 1–3 (1934). Neither of these ends are subserved in any direct way by an inflexible rule that opens company-level grievance proceedings to participation by minority unions.

We note, as well, that the current version of the statute does not contain the wording proposed unsuccessfully in 1934, or anything reasonably equivalent to it. Thus, far from assisting the plaintiff's cause, the Eastman/Harrison testimony and its aftermath suggest that Congress never accepted the notion of elective representation in grievance proceedings at the company level. In short, the legislative history of the RLA fails to furnish any decisive insights. We must look to the language of the statute itself without any conclusive behind-the-scenes guidance.

Landers lays special stress on 45 U.S.C. § 153, First(j), which, in respect to proceedings before the Board, provides that "[p]arties may be heard either in person, by

---

**2.** In RLA parlance, a "minor dispute" is typically "one concerning the resolution of grievances regarding the interpretation or application of existing collective bargaining agreements." *Railway Labor Executives' Association v. Boston & Maine Corporation*, 808 F.2d 150, 152 n. 1 (1st Cir.1986). If, for instance, the appellant was contesting the interpretation or application of the Agreement, his remonstrance would constitute a "minor dispute," thus subject to the grievance procedure, and ultimately to arbitration. But, Landers concedes that the appellees are correctly interpreting the Agreement. He says that, since the admitted interpretation abridges his rights under the RLA, a court has jurisdiction to consider the *validity* of the clause. In this, the appellant is correct.

counsel, or by other representatives, as they may respectively elect...." On close perscrutation, the initial promise of that allocution remains unfulfilled.

There is a world of difference between proceedings at the company level and those (more mature) proceedings which have reached the Board. The RLA recognizes the distinction, as does the caselaw. As the Eighth Circuit has observed: "In investigations, conferences or hearings by or before officers of the carrier an existing legal contract [collective bargaining agreement] controls, whereas the procedure before the Board is controlled by the statute." *Butler v. Thompson*, 192 F.2d 831, 833 (8th Cir.1951). At bottom, the appellant's reliance on § 3, First(j) of the RLA proves too much: Congress obviously knew how to employ language bestowing elective rights of representation upon workers, yet chose to do so only for hearings before the Board. In stark contrast to the largesse granted unequivocally by § 3,First(j), the draftsmen stated merely that resolution of minor disputes at the company level would be handled in the "usual manner." 45 U.S.C. § 153, First(i). The fact that Congress eschewed conferment of a specific right of elective representation in § 153, First(i), directly preceding § 153, First(j), forcefully imports the absence of any intent to mandate such a rule at the company level.

The appellant also cites 45 U.S.C. § 152, Second, to the effect that "[a]ll disputes between a carrier ... and its ... employees shall be considered ... in conference between representatives designated and authorized so to confer ... by the carrier ... and by the employees thereof interested in the dispute." Landers argues that this choice of phrase affords him a license to select his own union as his representative. We disagree.

Section 152, Second, spells out the overall duties of carriers, employees, and labor unions. It comprises a broadly general reference to the many kinds of controversies that might arise, not to specific procedures or to particular rights in dispute resolution proceedings between parties. As

the Supreme Court has declared, the statute "merely states the policy which ... other provisions buttress with more particularized commands." *General Comm. of Adjustment of the Bhd. of Locomotive Engineers for the Mo.-Kan.-Tex. R.R. v. Missouri-Kan.-Tex. R.R.*, 320 U.S. 323, 334, 64 S.Ct. 146, 151, 88 L.Ed. 76 (1943). *See also Edwards v. St. Louis-San Francisco Railroad Co.*, 361 F.2d 946, 953–54 (7th Cir.1966) (to like effect). In the absence of some more particularized impartation of the right, we cannot find an anodyne such as Landers seeks in § 152, Second.

The appellant's quest for the elusive right to minority union representation at the company level finds no warmer welcome in the noninterference statute, which assures that

> [r]epresentatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other....

45 U.S.C. § 152, Third.

The language of this section was intended to prohibit meddling by an employer with the majority's choice of a collective bargaining representative—not to enable an employee to pick his own (minority) union to counsel him at on-property disciplinary or grievance proceedings. *See* H.R. Rep. No. 1944, *supra*, at 2. There is nothing inconsistent between encouraging, on the one hand, freedom of choice among competing unions and requiring, on the other hand, that minor disputes at the company level be handled without recourse to "outside" unions.

Landers next adverts to § 152, Eleventh(c) as another source of his much-desired right to UTU representation. This proviso guarantees an employee the ability to satisfy all requirements of union membership by joining "any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services...." 45 U.S.C. § 152, Eleventh(c). The appellant asseverates that entitlement to permissive

representation by his union in disciplinary proceedings must ineluctably flow from this legislative protection of his right to join any qualified labor union in the first place. The conclusion, however, does not necessarily follow from the premise. Though we agree that representation by the union of one's choosing at a company-level hearing can be an important benefit of union membership, we do not find that § 152, Eleventh(c) conveys any such entitlement.

The sole aim of this statutory provision was to protect employees from being forced to join multiple unions—a clear danger in an industry in which workers shuttle time and again from employer to employer and from craft to craft. *Pennsylvania Railroad Co. v. Rychlik*, 352 U.S. 480, 489, 77 S.Ct. 421, 426, 1 L.Ed.2d 480 (1957). As *Rychlik* teaches, "the only purpose of Section 2, Eleventh(c) was a very narrow one: to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts." *Id.* at 492, 77 S.Ct. at 427. We endorse unreservedly the district court's reasoning on this point:

> The RLA accommodates a number of competing purposes. One purpose is to promote collective bargaining between members of a craft and the carrier by whom they are employed. In furtherance of that purpose, Congress provided that the union chosen by the majority of members of a particular craft employed by a carrier would represent all members of that craft in collective bargaining with that carrier. *See* 45 U.S.C. § 152, Sixth. But Congress also provided that, because of the peculiar nature of the railroad industry, including the frequent movement of employees among the different crafts, every member of a particular craft need not be required to belong to the union designated by the majority of the members of that craft. *See* 45 U.S.C. § 152, Eleventh(c). The RLA thus accommodates two sometimes conflicting interests—the interest in furthering collective bargaining for a craft as a whole and the interest in saving employees from the burden of frequent changes

in union membership. Because the right to belong to the union of one's own choice arises in this special context of competing interests, that right may not automatically include subsidiary rights, such as the right of representation in company disciplinary hearings, that might otherwise be thought necessary and incidental.

*Landers I,* slip op. at 11.

We recognize that an employee has a legitimate interest in representation by his own union at disciplinary hearings. But, the union that is the collective bargaining agent for a class of employees likewise has a legitimate interest—perhaps a stronger, more salient, interest—in representing all members of the class. If a minority union achieved a formalized role in the process, the collective bargaining contract itself could be skewed by, say, collusive interpretation, or by the innocent advancement of positions contrary to the intent of the bargaining agent. And, an unscrupulous railroad could too easily play off the accredited representative against the minority union, to undermine the status of both. So, the BLE—or any other "majority" union—has a considerable stake in the exclusive processing of disciplinary and grievance matters at the company level. As the Court remarked in the somewhat analogous precincts of the National Labor Relations Act,

> Union interest in prosecuting employee grievances is clear. Such activity complements the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing administration of the contract. In addition, conscientious handling of grievance claims will enhance the union's prestige with employees.

*Republic Steel Corp. v. Maddox,* 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965).

To the extent that provisions of the RLA, such as §§ 152, Sixth and Eleventh(c), appear to conflict with each other, we must interpret these provisions with a view toward the particular purposes undergirding both. Seen in this light, and in the context of the Act as a whole, § 152, Eleventh(c)

cannot be read as implying an automatic right of elective (minority union) representation at company-level disciplinary hearings.

### III.

We find the other statutory clauses hawked by Landers to be similarly unenlightening on this point. In our view, control of the protocol which infuses the handling of grievance or disciplinary matters of the sort here at issue is dictated by § 3, First(i) of the RLA, which provides that, at the company level,

> [t]he disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions ... shall be handled *in the usual manner* up to and including the chief operating officer of the carrier designated to handle such disputes; ....

45 U.S.C. § 153, First(i) (emphasis supplied).

In what is in some ways a spinoff of his version of the RLA's legislative history—a version which we have largely rejected, *see ante* Part II—Landers invites us to translate the statutory reference to the "usual manner" either as referring merely to the *procedures* habitually employed for processing grievances, or as a cryptic allusion to some code or pattern of industry-wide practice which informs the RLA. In either event, he pleads that the "usual manner" of processing on-property grievances necessarily means processing them with the assistance of an affected employee's own union (minority status notwithstanding), *i.e.*, that the "usual manner" terminology does not affect the *substantive* rights created by § 2, Eleventh(c), including what Landers perceives as the right to representation by the union of one's choice. As discussed *ante* Part II, we find that the creation of that ostensible right was not one of the limited objectives which § 2, Eleventh(c) was designed to achieve. We likewise find that § 2, Eleventh(c) is not the repository of the representational rights envisioned by

this appellant. Consequently, we disagree with Landers's (correspondingly) narrow interpretation of § 3, First(i). His arguments on this point fail to send a compelling signal.

Several cases have held that where there is a collective bargaining agreement in effect, the "usual manner" is determined by the provisions of the Agreement, and, absent more specific definition, by the (historical) standard practice within the given workplace or yard. *See Butler v. Thompson*, 192 F.2d at 833; *Switchmen's Union of North America v. Louisville and Nashville Railroad Co.*, 130 F.Supp. 220, 227 (W.D.Ky.1955). *But see Taylor v. Missouri Pacific Railroad Co.*, 794 F.2d 1082 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 670, 93 L.Ed.2d 721 (1986); *Coar v. Metro-North Commuter Railroad Co.*, 618 F.Supp. 380 (S.D.N.Y.1985). Despite the divided authorities (discussed *post* at Part IV), we find the statute relatively clear. The phrase "usual manner" calls for no unusual mental gymnastics in matters of lexicography. Read naturally and in context, it refers unreservedly to the customary way ("usual manner") in which disputes have been resolved by a given railroad and its workforce. If Congress meant to incorporate into § 153, First(i) some mythic national custom or praxis, or to limit the "usual manner" to the pristine precincts of pure procedure, it would simply have said so. The most plausible reading of this clause—the only reading which adequately explains its precise language and its juxtaposition with other statutory provisions—is that it adjusts itself, carrier-by-carrier, to fit the idiocratic contours of each and every line. The presence (or absence) of the opportunity to be represented by a minority union is one of these flexible adjustments.

The "usual manner" of dispute resolution, synthesized in this fashion, may restrict or enhance an employee's options relative to representation at company-level grievance or disciplinary proceedings. In contrast to § 153, First(j)—which assures an employee the right to the representation of his choice before the Board—there is, as

we have mentioned before, no such statutory guarantee applicable to company-level proceedings. Where, as here, a collective bargaining agreement is in place, representation rights must be based upon, and may be limited by, that pact. *See United Steelworkers of America, Local 1913 v. Union Railroad,* 648 F.2d 905, 911 (3d Cir.1981) ("The procedures followed in an investigative hearing, including the representation to which an employee is entitled, are governed by the applicable collective bargaining agreement."); *Edwards v. St. Louis-San Francisco Railroad Co.,* 361 F.2d at 954 ("[W]hen a railroad employee questions the propriety of the initial hearing held on carrier property, his claim must be based on the provisions of the collective bargaining agreement relating to that subject.")

In this case, consistent with the RLA and with the Agreement, the district court correctly looked to the practices in vogue in the particular workplace. The history of the "usual manner" was relatively easy to compile. Amtrak was a virtual neophyte in the business; it did not begin employing passenger engineers directly until 1983. Under Rule 21 of the Agreement, quoted *ante* at 43, only the affected engineer and the "duly accredited representative," *i.e.,* the designated official of the BLE, had the right to attend on-property hearings. The lower court found explicitly that "the usual manner of dispute resolution between Amtrak and its employees does not include the practice of representation of each employee by his own union." *Landers I,* slip op. at 14. Rather, Amtrak's "usual manner" was to allow only the collective bargaining agent to help employees at company-level disciplinary hearings. And, the convention was a consistent one. These findings have abundant record support as matters of *fact.* The resultant scenario did not in any way blunt the imperatives of the RLA. Thus, under the Agreement and the "usual manner" language of § 153, First(i), Landers had no basis for insisting that the UTU participate in his disciplinary hearing.

## IV.

We readily acknowledge the existence of respectable authority tending to support the appellant's position. We have examined these precedents and have discarded them only after careful study. There is little in the caselaw, closely read, which suggests to us that Landers is on the right track.

The most formidable precedent favorable to the plaintiff is *Taylor v. Missouri Pacific Railroad Co., supra,* where a panel of the Fifth Circuit concluded that the right of a railway worker to join the union of his choice—a right which, we agree, is guaranteed by the RLA—includes by necessary implication an entitlement to have that organization represent him at a company-level proceeding. *Taylor,* 794 F.2d at 1086. We resist the temptation to try to distinguish *Taylor,* and treat it as very much in point. But, we find its analysis of the central issue to be unpersuasive, and we decline to follow it.

We do not part company with so respected a tribunal lightly. We note, first, that the *Taylor* court, in its consideration of the pertinent provisions of the RLA, apparently neglected to weigh 45 U.S.C. § 153, First(i) appropriately in the balance. The opinion in *Taylor* made not the slightest mention of the "usual manner" language, nor did it attempt to divine the "usual manner" of dispute resolution at the employer's yard at the time in question.[3] Congress, as we have pointed out, was explicit in distinguishing between proceedings at the company level and those conducted before the Board. *Compare id. with* 45 U.S.C. § 153, First(j). We find this distinction to be purposeful, convincing, and, in the case before us, ultimately controlling.

Moreover, to the extent that *Taylor,* 794 F.2d at 1085, relied on § 152, Eleventh(c) as the source of a perceived right to allow a worker to choose his own union to repre-

---

3. We have scrutinized, too, the relevant decision below, *see Taylor v. Missouri Pacific Railroad Co.,* 614 F.Supp. 1320 (E.D.La.1985), and find no sign that the district court made any findings of fact whatever anent the "usual manner."

sent him, we find such reliance to have been mislaid (essentially for the reasons advanced in Part III hereof). This is especially so when one considers the extremely narrow purposes intended to be served by that statutory provision. *See Pennsylvania Railroad Co. v. Rychlik,* 352 U.S. at 492, 77 S.Ct. at 427. *Taylor* also suffers from a further miscalculation: it leaned heavily on the decision of the Seventh Circuit in *McElroy v. Terminal Railroad Ass'n of St. Louis,* 392 F.2d 966 (7th Cir. 1968), *cert. denied,* 393 U.S. 1015, 89 S.Ct. 611, 21 L.Ed.2d 559 (1969). This is a burden which *McElroy* cannot bear.[4] Lastly, we remark that, perhaps because of its misconceptions about *McElroy, Taylor* seems to have overlooked earlier, more pertinent, Seventh Circuit precedent. *See, e.g., Broady v. Illinois Central Railroad Co.,* 191 F.2d 73 (7th Cir.1951). *See also Edwards v. St. Louis-San Francisco Railroad Co., supra.* We think it is of considerable significance that the *McElroy* court, 392 F.2d at 971–72, rebuffed a fairly overt invitation to overrule these earlier cases.

*Coar v. Metro-North Commuter Railroad Co., supra,* comprises Landers's remaining heavy artillery. There, the district court found that membership in a minority union would be "meaningless" if engineers could not choose to have that union represent them in disciplinary proceedings. 618 F.Supp. at 383. As we have already explained, that is simply untrue. It would serve no purpose to reiterate our views on the subject, or to chart the exact ways in which *Coar* partakes of the weaknesses of *Taylor.*[5] Suffice it to say that, for the reasons mentioned, we regard *Coar,* like *Taylor,* to have fallen wide of the mark.

## V.

Although the appellant has made other arguments, they are uniformly meritless. We hear no whistles blowing. And, nothing would be gained by a ritualistic calling of the roll. It is enough to say that the RLA does not give a railroad worker an automatic right to secure representation by his own (minority) union at an on-property grievance or disciplinary hearing. Put another way, the various provisions of the RLA, singly and in their ensemble, do not per se invalidate labor contracts which purport to limit on-property representational rights in grievance and disciplinary matters to duly accredited bargaining agents. *Accord Broady v. Illinois Central Railroad Co.,* 191 F.2d at 76 ("We can find no provision of the Railway Labor Act which gives to employees the right to a representative of their own choice at an investigation by company officials of a charge that the employee has violated company rules."); *But-*

---

4. *McElroy* decided that a collective bargaining agreement between a railroad and the BLE did not bar a group of locomotive engineers from choosing another union (of which they were members) as their on-property representative for grievance purposes. 392 F.2d at 969. But, *McElroy* stemmed from "the unique situation presented ... where employees shuttle back and forth between their crafts," yet are represented by different unions in each craft. *Id.* at 971. In the case at bar, this situation did not obtain. The district court found "little or no shuttling between crafts by employees who work as passenger engineers for Amtrak." *Landers I,* slip op. at 15. Moreover, the parties stipulated that the BLE was the duly accredited representative for all crafts to which an Amtrak passenger engineer might conceivably transfer.

*McElroy* is also distinguishable in another critical respect: there, unlike here, the historical "usual manner" was amenable to the employees' request. Prior to the inception of the exclusive collective bargaining agreement, the employer had regularly permitted locomotive engineers who were members of a minority union to be represented by that union in respect to company-level grievance and disciplinary problems. *Id.* at 968. Thus, the "usual manner" was to allow such representation. *Id.* at 969. In contrast, as we have noted in the text, the "usual manner" at Amtrak has been to permit only the collective bargaining representative to function in this capacity. Viewed in this light, *McElroy* reinforces—rather than undermines—our rejection of *Taylor.*

5. The core of *Coar* is particularly vulnerable because of its misplaced dependency on isolated excerpts from the legislative history of the RLA—passages which, as we have already pointed out, *see ante* at 43–44, cannot carry such cargo. Although *Coar* quotes Commissioner Eastman correctly, 618 F.Supp. at 384, the *Coar* court neglects to mention that the quoted remarks were mere advocacy favoring a proposed amendment to § 2, Fourth—an amendment which was defeated rather than enacted. *Taylor,* which perfunctorily accepted *Coar's* view of the legislative history, 794 F.2d at 1086, suffers from the same infirmity.

*ler v. Thompson,* 192 F.2d at 833 (same). Read as a whole, we find the RLA to be clear and unambiguous in this regard, and we believe it represents a reasonable compromise of the centrifugal and centripetal forces which are at work in cases such as this.

We conclude, as did the district court, that Landers's right to representation by the UTU at the company level was governed by the Agreement and thus by the "usual manner" of dispute resolution between Amtrak and its passenger engineers. The court's fact-based determination that the "usual manner" prevalent at this workplace did not involve representation by a union other than the "majority" union—the collective bargaining agent—was not clearly erroneous. And the Agreement—which, when construed in this fashion, prohibited the appellant from being assisted by the UTU at the February 1984 hearing—was not in derogation of any provision of the RLA. Landers need not join the BLE; but, unless and until the Agreement or the "usual manner" is changed, he and others similarly situated must forgo representation by their own (minority) union at the initial stages of grievance and disciplinary proceedings.

The judgment of the district court is, therefore,

*Affirmed.*