United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit


No. 96-1378

DOUGLAS T. WIGHTMAN, ET AL.,

Plaintiffs, Appellants,

v.

SPRINGFIELD TERMINAL RAILWAY COMPANY
AND UNITED TRANSPORTATION UNION,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Bownes, Senior Circuit Judge, 
and Stahl, Circuit Judge. 



Harold A. Ross with whom Ross & Kraushaar Co., L.P.A., Shelley B. 
Kroll, and Segal, Roitman & Coleman were on brief for appellants. 
John R. Nadolny for appellee Springfield Terminal Railway Co. and 
Norton N. Newborn with whom Norton N. Newborn Co., L.P.A., James F. 
Freeley, Jr. and Freeley & Freeley were on brief for appellee United 
Transportation Union.



November 19, 1996


STAHL, Circuit Judge. Appellants, Brotherhood of STAHL, Circuit Judge. 

Locomotive Engineers and several of its individual members

("BLE") sought to enjoin enactment of a clause in a newly

negotiated collective bargaining agreement between Appellees

United Transportation Union ("UTU") and Springfield Terminal

Railway Co. ("ST"), as a violation of the Railway Labor Act

("RLA"), 45 U.S.C. 151-188. The district court denied the

injunction and granted summary judgment for UTU and ST on

BLE's complaint. Wightman v. Springfield Terminal Ry. Co., 

915 F. Supp. 503, 507 (D. Mass. 1996). BLE now appeals.

Background Background 

The RLA governs labor and collective bargaining

arrangements between carriers, or employers, and unions. ST

is a railroad operator located in Springfield, Massachusetts,

and a carrier for purposes of the RLA. BLE and UTU are two

of several trade unions who have collective bargaining

agreements with ST. The individual plaintiffs in this case

belong to BLE. The RLA authorizes carriers and unions to

establish union shops. A union shop in the railroad industry

simply means that in order to remain employed with a railroad

company, employees must belong to one of the national, RLA

recognized railroad unions. See 45 U.S.C. 152, 

Eleventh(a) and (c).1 ST and the unions with which it

 

1. 45 U.S.C. 152 has been drafted in subsections First
through Eleventh. Section 152, Eleventh contains subsections
a through d. We note the unusual numbering scheme to explain

-2- 2

maintains collective bargaining agreements have established a

union shop. 

Employment in the railroad industry revolves around

crafts or classes of work, each of which is represented by a

different union. Train service and engineer service

constitute two such crafts. The former encompasses

conductors, brakemen, trainmen and yardmen, and the latter

includes primarily locomotive engineers. UTU represents the

train service craft and BLE represents the engineer service

craft. 

By practice, junior engineers advance from the

ranks of the train service employees. Over the course of any

given year, however, the amount of engineer work may

fluctuate. During periods of reduced engineer work, junior

engineers may have to return temporarily to train service in

order to remain employed.2 Junior engineers, therefore, have

an economic interest in maintaining their train service

seniority. 

Prior to 1995, the UTU-ST collective bargaining

agreement allowed non-UTU member engineers to continue to

accrue train service seniority. In 1995, however, UTU

negotiated a provision known as Article 21, which requires

 

our citation. 

2. In its reply brief, BLE appears to hint that the ebb and
flow of train service employees to and from engineer service
occurs with less regularity today than in prior eras. 

-3- 3

that employees moving from train service to engineer service

pay dues to UTU in order to maintain and continue to accrue

their train service seniority. When BLE objected to Article

21, ST offered it a similar provision which BLE rejected,

apparently believing it to be of little value to its

membership. 

BLE then challenged Article 21 on RLA grounds. It

sought preliminary injunctive relief which the district court

denied. Subsequently, on cross motions, the district court

granted summary judgment in favor of UTU and ST. This appeal

followed. 

Standard of Review Standard of Review 

We review the award of summary judgment de novo. 

Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7, 11 (1st Cir. 1996). 

Summary judgment is appropriate in the absence of a genuine

issue of material fact, when the moving party is entitled to

judgment as a matter of law. See Fed. R. Civ. P. 56(c). 

Neither party may rely on conclusory allegations or

unsubstantiated denials, but must identify specific facts

deriving from the pleadings, depositions, answers to

interrogatories, admissions and affidavits to demonstrate

either the existence or absence of an issue of fact. See 

Fed. R. Civ. P. 56(c) and (e).

Cross motions for summary judgment neither alter

the basic Rule 56 standard, nor warrant the grant of summary

-4- 4

judgment per se. See Wiley v. American Greetings Corp., 762 

F.2d 139, 141 (1st Cir. 1985). Cross motions simply require

us to determine whether either of the parties deserves

judgment as a matter of law on facts that are not disputed.

Id. As always, we resolve all factual disputes and any 

competing, rational inferences in the light most favorable to

the party against whom summary judgment has entered. Den 

Norske Bank v. First Nat'l Bank of Boston, 75 F.3d 49, 53 

(1st Cir. 1996). 

Discussion Discussion 

BLE raises three basic arguments, each of which

involves a different statutory provision of the RLA. First,

BLE contends, Article 21 violates the prohibition of mandated

dual unionism under 45 U.S.C. 152, Eleventh(c). Second,

BLE urges, Article 21 impermissibly interferes with

employees' rights to organize and choose their own collective

bargaining representative under 45 U.S.C. 152, Third and

Fourth. Finally, BLE asserts, the RLA, 45 U.S.C. 156,

required UTU and ST to provide BLE, an interested party,

notice of their contract negotiations and an opportunity to

participate in them. We conclude that the district court

ably analyzed each of BLE's arguments and properly found them

lacking in substance. We affirm.

A. 45 U.S.C. 152, Eleventh(c) 

-5- 5

According to BLE, Article 21 violates 45 U.S.C. 

152, Eleventh(c), part of the union shop provisions of the

RLA. Analysis of BLE's argument requires a brief detour into

the background of the union shop provisions generally, and

how 152, Eleventh(c) fits into the union shop scheme. 

Under 45 U.S.C. 152, Eleventh(a), carriers and

unions may establish union shops. Section 152, Eleventh(a)

specifically provides that carriers and unions may "make

agreements, requiring as a condition of continued employment,

that . . . all employees shall become members of the labor

organization representing their craft or class." Read in

isolation, the plain language of this provision would allow

carriers and unions to require employees to belong not to the

union of their choice, but to the union certified as the

representative of their craft or class.

Organized labor petitioned Congress for the union

shop option in order to eradicate the problem of "free

riders," railroad employees who do not pay dues to any union

but receive whatever benefits collective bargaining confers.

See generally Pennsylvania R.R. Co. v. Rychlik, 352 U.S. 480, 

489-94 (1957). In acceding to labor's request, however,

Congress recognized that the intercraft mobility not uncommon

in the railroad industry could pose a problem for employees

in a union shop. Under 152, Eleventh(a), an employee

shuttling between train service and engineer service could

-6- 6

either be forced to change unions or to belong and pay dues

to two unions until reaching a level of seniority sufficient

to stabilize him as an engineer. As the Supreme Court

pointed out, "[t]he former alternative would, of course, be

expensive and sometimes impossible, while the latter would be

complicated and might mean the loss of seniority and union

benefits." Id. at 490. Congress attempted to tailor 

union shops to accommodate intercraft mobility through 152,

Eleventh(c). That subsection provides, "[t]he requirement of

membership in a labor organization in [a union shop] shall be

satisfied . . . if said employee shall hold or acquire

membership in any one of the labor organizations, national in

scope, organized in accordance with this chapter." 45 U.S.C.

152, Eleventh(c). On its face, 152 Eleventh(c) appears

to contradict 152, Eleventh(a) by allowing any employee in

any union shop to belong to any of the RLA recognized

railroad unions. 

The purpose of 152, Eleventh(c), however,

significantly circumscribes its language. See Rychlik, 352 

U.S. at 488, 492; see also Landers v. Nat'l R.R. Passenger 

Corp., 814 F.2d 41, 44-45 (1st Cir. 1987) (recognizing 

limited applicability of 152, Eleventh(c)), aff'd, 485 U.S. 

652 (1988). Despite its broad language, "the only purpose of

Section 2, Eleventh(c) was a very narrow one: to prevent

compulsory dual unionism or the necessity of changing from

-7- 7

one union to another when an employee temporarily changes

crafts." Landers v. Nat'l R.R. Passenger Corp., 485 U.S. 

652, 657-58 (1988); Rychlik, 352 U.S. at 492. Section 152, 

Eleventh(c) does not exist to benefit unions by permitting

them to recruit members from the ranks of other established

unions, or to provide railroad employees with a general right

to join unions other than the designated bargaining

representative of their craft, except to meet the narrow

problem of intercraft mobility in a union shop. Rychlik, 352 

U.S. at 493. 

Bearing in mind the context and purpose of 152

Eleventh(c), we turn to BLE's challenge to Article 21. BLE

essentially attacks Article 21 from two angles. First, BLE

contends, Article 21 constitutes either a 152, Eleventh(a)

union shop agreement that violates 152, Eleventh(c) or an

amendment to the existing ST-UTU agreement that violates 

152, Eleventh(c). Second, BLE argues, Article 21 will upset

"the cost sharing scheme which was continued and fostered by

the 1951 union shop amendments." We disagree. 

On its face, Article 21 can neither constitute a

union shop agreement by itself, nor an amendment to the ST-

UTU agreement that violates Eleventh(c). Nothing in the

language of Article 21 requires membership in UTU or any

other union as a condition of employment. See Brotherhood of 

Locomotive Eng'rs v. Kansas City S. Ry., 26 F.3d 787, 793 

-8- 8

(8th Cir.) ( 152, Eleventh(c) applies only to a 152,

Eleventh(a) union shop agreement), cert. denied, 115 S. Ct. 

320 (1994); Dempsey v. Atchison, Topeka and Santa Fe Ry. Co., 

16 F.3d 832, 838 (7th Cir.) (same), cert. denied, 115 S. Ct. 

82 (1994). Article 21 does not require an engineer to choose

between dual union membership or unemployment; Article 21

simply requires an engineer to choose whether to retain and

continue to accrue seniority in the train service craft.

Wightman, 915 F. Supp. at 506.  

In Dempsey v. Atchison, Topeka and Santa Fe Ry. 

Co., 16 F.3d 832, 838 (7th Cir. 1994), the Seventh Circuit 

faced a BLE challenge to a provision requiring engineers

desirous of accumulating additional train service seniority

to pay dues to UTU. Failure to pay, however, would not

affect accrued seniority. In examining whether the provision

constituted a union shop agreement, the Seventh Circuit

relied in part on the fact that it did not require payment of

dues to UTU in order to retain accrued seniority, implying

that such a provision might constitute a union shop

provision. Id. at 838 (citing NLRB v. Manitowoc Engineering 

Co., 909 F.2d 963, 969-71 (7th Cir. 1990), cert. denied, 

Clipper City Lodge No. 516 v. NLRB, 498 U.S. 1083 (1991)). 

Ultimately, the court concluded that the provision at issue

did not create any conditions of continued employment, and

-9- 9

therefore, did not constitute a 152, Eleventh(a) union shop

agreement. Id.  

In our view, the extra step Article 21 takes with

respect to accrued seniority does not create any conditions

on employment different from the provision in Dempsey. As 

indicated, nothing on the face of Article 21 requires

employees to belong to UTU in order to remain employed.

Despite the fact that Article 21 takes the extra step of

conditioning seniority retention and accrual on continued

dues payment, an engineer who chooses BLE over UTU satisfies

either of the UTU-ST or BLE-ST union shop requirements. To

the extent, therefore, that Dempsey implies that a provision 

such as Article 21 might constitute a union shop agreement or

amendment, we respectfully disagree. 

BLE, however, asserts that engineers who choose BLE

over UTU run the risk of unemployment when shuttled back to

train service, since they will have no train service

seniority. According to BLE, this effectively forces those

engineers at the lower end of the engineer seniority list

either to belong to UTU and BLE, or to UTU instead of BLE, as

a condition of continued employment at ST. BLE asserts that

152, Eleventh(c) allows a railroad employee in a union shop

to change membership to any other RLA recognized union,

"without putting himself out of compliance with the

membership requirement of a valid union shop agreement and

-10- 10

thereby cause a loss of seniority and employment rights."

BLE's argument requires us to determine whether 152,

Eleventh(c), in protecting against compulsory dual unionism,

elevates seniority into a statutorily protected right

employees may take with them as they move from craft to craft

and union to union. 

By its own language, the RLA governs relations

between carriers, unions and employees, and 152,

Eleventh(c) dictates the limits of what carriers and/or

unions can demand of employees in a union shop. Within those

parameters, which include a prohibition on compulsory dual

unionism, the RLA makes no mention of seniority, and notably

fails to designate seniority as a protected employment right.

In the absence of a legislative pronouncement to

the contrary, union contracts typically define the scope and

significance of seniority rights. Aeronautical Indus. Dist. 

Lodge v. Campbell, 337 U.S. 521, 526 (1949); Trailmobile Co. 

v. Whirls, 331 U.S. 40, 53 n.21 (1947). Seniority, 

therefore, does not stem from the employer-employee

relationship and by extension become an employment right, but

rather from either a statute or the four corners of a

collective bargaining agreement, in this case between a union

and a carrier. National Labor Relations Bd. v. Whiting Milk 

Corp., 342 F.2d 8, 10-11 (1st Cir. 1965). It is by now well 

-11- 11

established that in the absence of a contract creating

seniority rights, they do not exist. See Dempsey, 16 F.3d at 

839; United Food & Commercial Workers Union v. Gold Star 

Sausage Co., 897 F.2d 1022, 1026 (10th Cir. 1990); Cooper v. 

General Motors Corp., 651 F.2d 249, 250 (5th Cir. 1981) 

(citing cases); Local 1251 Int'l Union of United Auto., 

Aircraft and Agric. Workers of Am. UAW v. Robertshaw Controls 

Co., 405 F.2d 29, 32-33 (2d Cir. 1968) (citing cases) 

(overruling prior circuit precedent to the contrary).

Seniority, like any other benefit deriving

exclusively from collective bargaining agreements, does not

vest in employees. Robertshaw, 405 F.2d at 33; McMullans v. 

Kansas, Okla. & Gulf Ry., 229 F.2d 50, 53 (10th Cir. 1956). 

Instead, seniority rights are subject to revision or even

abrogation with the termination or renegotiation of the

collective bargaining agreement.3 Dempsey, 16 F.3d at 839; 

Robertshaw, 405 F.2d at 33; McMullans, 229 F.2d at 54. Any 

rights employees have in seniority, therefore, are tied

directly to the terms of the labor agreement between the

carrier and the union representing their craft. Nothing in

 

3. The Dempsey opinion ultimately views seniority as we do, 
despite that court's implication that a provision such as
Article 21 might constitute a union shop agreement. See 16 
F.3d at 838-39. Dempsey concludes that seniority, born of 
the collective bargaining agreement, is subject to revision
or abrogation. 16 F.3d at 839. We do not interpret Dempsey, 
therefore, as supporting BLE's argument. 

-12- 12

the RLA changes this fundamental tenet of labor law.4

Dempsey, 16 F.3d at 840; McMullans, 229 F.2d at 53.  

We recognize that Article 21 may make it attractive

for at least some engineers to choose UTU over BLE. We stop

short, however, of equating a union's successful negotiation

of a potential competitive advantage over another union with

the kind of compulsory dual unionism 152, Eleventh(c)

exists to prevent. See Whiting Milk, 342 F.2d at 11 

("Obtaining a benefit for employees may well encourage others

to join a union but that side effect does not violate the

[NLRB], for 'The truth is that the union is a service agency

that probably encourages membership whenever it does its job

well.'") (quoting Local 357, Int'l Bhd. of Teamsters v. NLRB, 

365 U.S. 667, 675-76 (1961)). We conclude that 152,

Eleventh(c) does not provide the statutory basis to vest

railroad employees with their accrued seniority. 

Finally, BLE asserts that Article 21 "upsets the

sharing of costs of representation promoted by the 1951

amendments" in violation of 152, Eleventh(c).

 

4. BLE relies on three cases in support of its contention
that Article 21 constitutes an illegal union shop agreement:
Felter v. Southern Pac. Co., 359 U.S. 326 (1959), Birkholz v. 
Dirks, 391 F.2d 289 (7th Cir. 1968), vacated as moot, 395 
U.S. 210 (1969) and O'Connell v. Erie Lackawanna R.R., 391 
F.2d 156 (2d Cir. 1968), vacated as moot, 395 U.S. 210 
(1969). BLE asserted these cases unsuccessfully to the
Seventh Circuit in support of a nearly identical argument.
See Dempsey, 16 F.3d at 838 n.6. We concur in that court's 
conclusion that these cases are inapposite. 

-13- 13

Section 152, Eleventh(c) limits employees in a

union shop to membership in those unions which qualify as

electors of the union representatives on the National

Railroad Adjustment Board ("NRAB"). The NRAB exists to

settle disputes arising under collective bargaining

agreements. See Rychlik, 352 U.S. at 487. As the Seventh 

Circuit pointed out, this requirement limits union shop

participation to those unions which share the costs of

administering the NRAB, and which "join together in other

respects in the negotiating and policing of collective

bargaining agreements under the dispute mechanisms of the

RLA." Dempsey, 16 F.3d at 840. BLE appears to argue that 

Article 21 has the effect of depriving it of dues that would

offset its obligations to NRAB. See id. Nothing in the RLA, 

however, guarantees BLE a particular level of dues to offset

its obligations to NRAB. Stated more broadly, the RLA does

not protect any one union from competition with another over

membership and dues. 

B. 45 U.S.C. 152, Third and Fourth 

Section 152, Third, entitled "Designation of

representatives," provides that neither unions nor carriers

"shall in any way interfere with, influence, or coerce the

other in its choice of representatives." Section 152,

Fourth, dealing with organization and the collective

bargaining process, grants employees the right to organize

-14- 14

and bargain collectively through representatives of their own

choosing, and provides that no carrier may influence or

coerce employees regarding their choice of labor

organization, nor deduct dues or other fees of such

organizations from employee wages. BLE contends that Article

21 violates the employee freedom of choice embodied in Third

and Fourth, and also the prohibition on wage deductions in

Fourth. Again, we disagree.

In TWA, Inc. v. Independent Fed. of Flight 

Attendants, 489 U.S. 426, 441 (1989), the Supreme Court noted 

that 152, Third and Fourth operate primarily in pre-

certification contexts, where unorganized employees seek to

designate representatives and commence collective bargaining

with employers. The Court reasoned that the RLA contemplates

dispute resolution through private mechanisms, the success of

which depends on the independence of the employees' "putative

representative" and on neither party's access to the courts

to further their own partisan ends. Id. (quoting Switchmen 

v. National Mediation Bd., 320 U.S. 297, 300 (1943)). In a 

post-certification context, by contrast, the parties already

have certified representatives and a collective bargaining

record in place. In post-certification disputes, therefore,

we must limit our intervention to cases in which the

aggrieved union has no other remedy "to enforce the statutory

commands which Congress had written into the [RLA]." Id.  

-15- 15

We have concluded that intervention in a post-

certification dispute under 152, Third and Fourth will

occur in extremely limited circumstances. See National R.R. 

Passenger Corp. v. International Ass'n of Machinists and 

Aerospace Workers, 915 F.2d 43, 51 (1st Cir. 1990). 

Specifically, we will intervene upon demonstration of carrier

conduct reflecting anti-union animus, an attempt to interfere

with employee choice of collective bargaining representative,

discrimination, or coercion. Id. In addition, we will 

intervene when a carrier commits acts of intimidation that

cannot be remedied by administrative means, or commits a

fundamental attack on the collective bargaining process or

makes a direct attempt to destroy a union. Id.  

BLE purports to establish a genuine issue of

material fact by listing 15 "facts" which it claims

demonstrate anti-BLE animus sufficient to justify post-

certification judicial intervention. We need not recite all

of them here. We agree with the district court that BLE's

facts, even if all true, at best demonstrate sharp bargaining

practices between unions in an effort to gain competitive

advantage. Wightman, 915 F. Supp. at 507. While BLE's facts 

evince competitive jockeying between it and UTU, they notably

fail to demonstrate anti-BLE animus or a fundamental attack

-16- 16

on the bargaining process by ST.5 Accordingly, the District

Court correctly declined to intervene in this post-

certification matter.

BLE also contends that Article 21 violates 152,

Third and Fourth as a matter of law.6 BLE offers precedent

under the National Labor Relations Act ("NLRA"), which it

seeks to apply analogically to this railroad dispute. While

the NLRA may provide analogies that bear on interpretation of

the RLA, the Supreme Court has emphasized that "the NLRA

'cannot be imported wholesale into the railway labor arena.'"

TWA, 489 U.S. at 439 (quoting Trainmen v. Jacksonville 

Terminal, 394 U.S. 369, 383 (1969)). We especially hesitate 

to employ NLRA precedent in light of the clear and

unequivocal RLA precedent from the Supreme Court, this

circuit and others, which underscores the limited post-

certification application of 152, Third and Fourth. See 

TWA, 489 U.S. at 441 (limiting application of 152, Third 

and Fourth to pre-certification contexts); Nat'l R.R. 

 

5. To be sure, it does not appear that ST was entirely
candid with BLE regarding its negotiations with UTU and the
substance of the ST-UTU agreement. The RLA, however, does
not compel ST to inform BLE of the substance of negotiations
with a third union, and we do not identify anti-BLE animus in
ST's actions. 

6. BLE essentially argues that by making it so attractive
for engineers to join UTU, Article 21 has the effect of
impermissibly interfering with their free choice of union,
and coercing them to join UTU, in violation of 152, Third
and Fourth.

-17- 17

Passenger, 915 F.2d at 51 (same); see also Kansas City S., 26 

F.3d at 795; Dempsey, 16 F.3d at 841. Finally, BLE argues 

somewhat opaquely that a wage deduction provision only passes

RLA muster if it comprises part of a union shop agreement

under 152, Eleventh. At the outset we note that Article 21

by itself does not refer to wage deductions, much less

mandate them. Assuming such a wage deduction exists,

however, we disagree with BLE's interpretation of 152,

Fourth and Eleventh(b). 

As indicated, 152, Fourth provides that carriers

may not deduct union dues or fees from employee wages.

Section 152, Eleventh(b), however, provides that carriers and

labor organizations may make agreements providing for the

deduction of "any periodic dues, initiation fees, and

assessments" from employee wages as long as the employee has

given the carrier written permission. 45 U.S.C. 152,

Eleventh(b). Section 152, Eleventh(b), unlike Eleventh(c),

does not limit its applicability to Eleventh(a), or union

shop agreement situations. See Kansas City S., 26 F.3d. at 

794. Read together, 152, Fourth and Eleventh(b) provide

that carriers may not unilaterally deduct dues from employee

wages, but may do so upon the agreement of all parties

involved. See id. Thus, even in the absence of a union shop 

agreement, employees and carriers may agree to a dues

deduction schedule under 152, Eleventh(b). 

-18- 18

C. 45 U.S.C. 156, Bargainable Interest 

BLE contends that the District Court erred in not

setting Article 21 aside on the basis that UTU and ST failed

to notify BLE of their negotiations, and afford BLE the

opportunity to participate in them. 

The RLA mandates that "[c]arriers and

representatives of the employees shall give at least thirty

days' written notice of an intended change in agreements

affecting rates of pay, rules, or working conditions" to

interested parties. 45 U.S.C. 156. BLE identifies itself

as an interested party, and contends that ST or UTU owed it

notice. BLE also contends that it has joint jurisdiction

over collective bargaining between ST and UTU, at least with

respect to train service seniority, by dint of the routine

shuttling of employees between the train service and engineer

service crafts. According to BLE, that joint jurisdiction

shouldhavegivenitanopportunitytoparticipateinthenegotiations.

The Eighth Circuit recently faced BLE's argument

and concluded that neither the carrier nor UTU had any

statutory obligation to provide BLE with notice or the

opportunity to participate in negotiations, a conclusion with

which we substantially agree. See Kansas City S., 26 F.3d at 

792. 45 U.S.C. 156 exists to prevent either a carrier or

union from unilaterally changing the terms of the operative

collective bargaining agreement. Order of Railway Conductors 

-19- 19

and Brakemen v. Switchmen's Union of N. Am., 269 F.2d 726, 

733 (5th Cir.), cert. denied, 361 U.S. 899 (1959). Section 

156, therefore, furthers the overall purpose of the RLA to

permit employees to choose their own bargaining

representative freely, and to ensure a procedure for "the

commencement of conferences between representatives of the

two parties if changes are to be made in the contract."

McMullans, 229 F.2d at 56. Section 156 does not exist to 

open collective bargaining negotiations between a carrier and

a union to any other union claiming an interest. 

BLE relies chiefly on two cases, neither of which

compel the conclusion BLE seeks. The first, Brotherhood of 

Locomotive Eng'rs v. National Mediation Board, 410 F.2d 1025, 

1030 (D.C. Cir.), cert. denied, 396 U.S. 878 (1969), involved 

a dispute between BLE and the firemen's union over apprentice

engineers, a new class of railroad employees. The court

determined that in the absence of a certified representative

for the new class, any union that could fairly claim

representation over the apprentices could legitimately

bargain with the carrier about the terms and conditions of

the apprentices' employment. Id. By demonstrating a fair 

claim of representation, therefore, a union established a

right to notice and the opportunity to participate under the

RLA. Id. This case, by contrast, involves collective 

bargaining between a represented class of employees and their

-20- 20

carrier. BLE does not assert any claim of representation

over UTU members, nor could it. Train service employees have

already certified UTU as their bargaining representative.

National Mediation Board, therefore, does not support BLE's 

asserted interest in the negotiations that produced Article

21.

BLE also relies on Illinois Cent. R.R. Co. v. 

Brotherhood of Locomotive Eng'rs, 443 F.2d 136, 138, (7th 

Cir. 1971). The dispute in Illinois Central involved a 

tripartite agreement between the carrier, BLE and UTU

governing the list of train service employees eligible for

engineer work. UTU filed suit when BLE sought to negotiate

revisions to the rules governing the list without providing

UTU notice and an opportunity to participate. The court,

noting the tripartite agreement, determined that UTU and BLE

shared joint negotiating interests over the list, and

therefore, that BLE could not unilaterally negotiate rule

revisions with the carrier. Id. at 141. 

Obviously no formal tripartite agreement exists in

this case. BLE, however, points to language in Illinois 

Central indicating that even in the absence of such an 

agreement, the ebb and flow of employees between the two

crafts would give the firemen an "important economic stake in

the rules regulating the extra list" which in turn would

establish a bargainable interest in UTU over rules governing

-21- 21

the list. Id. at 141-42. BLE argues that the same ebb and 

flow vests it with a bargainable interest in the negotiation

of train service seniority. 

We disagree with BLE's interpretation of Illinois 

Central. First, that case revolved around a list outside of 

either UTU's or BLE's collective bargaining agreements with

the carrier. The rules governing the extra list, moreover,

placed direct conditions on a fireman's employment -- they

dictated which of the firemen could also engage in engineer

work. BLE's assumption of sole negotiating responsibility

over rules governing the list placed BLE in the position of

representing firemen even though the firemen had certified

UTU as their collective bargaining agent. 

In this case, by contrast, UTU does not seek to

unilaterally govern the ebb and flow itself. UTU, through

Article 21, has simply negotiated with ST the mechanism

through which train service employees accrue seniority, as

part of negotiations over a general collective bargaining

agreement. BLE and UTU have no tripartite agreement, nor is

UTU attempting to unilaterally negotiate a set of rules

governing movement between the two crafts. 

As the Eighth Circuit concluded, 

"[t]he distinctive division of railroad
employees under the RLA into crafts or
classes, and the regular movement of
employees among the crafts that is
characteristic of the industry, portends
overlapping 'interests' among bargaining

-22- 22

units in the composition of the crafts
and in their labor agreements. That sort
of interest, however, does not confer
upon all unions the right to notice and
participation in the arbitrations of all
other unions."

Kansas City S., 26 F.3d at 791-92. We conclude that the RLA 

does not provide BLE with a bargainable interest in Article

21 such that ST and UTU owed BLE notice and an opportunity to

participate in the negotiations. 

Affirmed. Affirmed 

-23- 23